[No. 30883. Department One. June 23, 1949.]

THE STATE OF WASHINGTON, *Appellant,* v. HUBERT BYRON
GILLINGHAM, JR., *Respondent.*[1]

[1]Reported in 207 P. (2d) 737.

*James F. Wickwire* and *Nat W. Washington,* for appellant.

*Clifford O. Moe* and *Roy A. Huse,* for respondent.

STEINERT, J.—The defendant was charged by information with the crime of grand larceny, alleged to have been committed as follows:

"That the said HUBERT BYRON GILLINGHAM, Jr., in the County of Grant, State of Washington, on or about the 17th day of February, 1948, then and there being, wilfully, unlawfully and feloniously did take, steal and carry away about 804 pounds of copper wire of the value of more than $25.00, to-wit: of the value of $104.50 in lawful money of the United States, the property of Alec Cook, with the intent to deprive and defraud the said Alec Cook thereof."

The cause proceeded to trial before a jury. At the conclusion of the state's evidence, the defendant moved for a directed verdict of not guilty. The court granted the motion and by verbal instruction, followed by the entry of a written order to the same effect, directed the jury to return a verdict of acquittal. The jury complied with the court's

direction and order, and, upon entry of the verdict, the state appealed.

Appellant assigns error on the part of the trial court (1) in holding that the evidence introduced by the state was insufficient to take the case to the jury on the question of whether respondent, Hubert Byron Gillingham, Jr., was guilty of the crime charged in the information, and (2) in refusing the state's offer of proof of certain facts and circumstances allegedly tending to identify respondent as the perpetrator of the crime. The questions presented by these assignments of error necessarily require an examination and evaluation of the evidence which the state introduced and also a consideration of certain additional evidence which was offered by the state, but was rejected by the trial court.

At all times relevant herein, Alex Cook, referred to in the information as Alec Cook, was the owner of a farm comprising something over four hundred acres, situated about a mile and a quarter southeast of Wilson Creek, in Grant county. Lavene Cook, son of Alex Cook, resided upon the farm and conducted the operation thereof.

Extending across the northerly portion of this property and running in an easterly-westerly direction were two parallel highways, designated as old primary state highway No. 7 and new primary state highway No. 7, respectively. The farmhouse and other buildings were located just south of the old highway and about seventy-five yards north of the new highway. Approximately one hundred fifty-six acres of the farm immediately south of the farm buildings were devoted to raising grain; the remainder of the land, lying further south, was used for pasturing cattle.

A dead three-wire power line, which belonged to Alex Cook, extended from a point on the old highway, near the farmhouse, in a southerly and southwesterly direction, to an old abandoned soda mine, or soda lake, located in the southern part of the Cook land. This power line included about nineteen poles situated approximately two hundred forty feet apart, the first pole south of the new highway being about one hundred twenty-five yards south of the farm-

house. At least the first ten of these poles were plainly visible from Cook's dwelling house.

From the easterly side of the Cook farm an old road led in a southwesterly direction to the soda mine, or soda lake, mentioned above. This road ran practically parallel with, and just a short distance east of, the power line, but crossed the line near its southern terminus, near the soda mine.

At the time the new highway No. 7 was constructed, the wires of the power line were severed at the place where the line crossed the new road and the respective ends of the wires thus severed were rolled backward and hung upon the nearest pole on each side of the new highway. The rest of the power line was left intact, though unused. Neither Alex Cook nor Lavene Cook ever gave anyone permission to remove any portion of the wire from the poles.

Respondent, Hubert Byron Gillingham, Jr., is a farmer residing upon and operating a large ranch a few miles distant from the Cook farm.

The state's case rested chiefly upon the testimony of Lavene Cook, Wado Bush, who was a deputy sheriff, and Charles E. Sanders.

Lavene Cook testified, in substance, as follows: At about nine o'clock in the morning of February 17, 1948, while he was standing near his garage, he observed a red Studebaker truck parked for a short while on the new highway at a point about fifty yards east of the place where the power line crossed that highway, and about seventy-five yards distant from him. He was "almost sure" that it was respondent's truck, with which Cook was familiar by reason of having seen it elsewhere on other occasions. He observed a number of people in the truck at this particular time, but did not know how many persons there were, nor did he recognize any of them. He did not identify respondent as one of its occupants and had no "idea who was driving it" that morning, although he said the truck proceeded away in a westerly direction.

That same night, at about ten o'clock, Cook went outside his house to look around the premises, and, on turning on his floodlights, saw a truck that "looked like" the one he

had observed earlier that day. The truck was standing on the highway at about the same place where he "had seen it in the morning." Shortly thereafter, the truck drove away, but Cook did not see, and could not tell, who was driving it.

On February 20th, Cook went out to his pasture, in the southern part of his farm, to look over his cattle. He at that time noticed that a number of poles of the power line had been pushed over, apparently by means of a truck, and that the wire had been removed from the entire power line. However, he was unable to state when he had last seen the wire in place, nor could he testify as to any specific time that the wires were still attached to the poles, either prior or subsequent to February 1st of that year. Furthermore, he could not recall when he had last been at the soda mine, where he could have had a complete view of the eight or nine poles constituting the southern half of the power line.

Upon his discovery of the condition of the poles and the removal of the wire, Cook immediately communicated with the sheriff's office, and, in response to his call, Wado Bush, a deputy sheriff, went out to the Cook farm. The two men thereupon inspected the area surrounding the pole line and then discovered tire tracks along the length of the line, indicating that a truck having six wheels had been used to push over some of the poles. These tracks appeared to have been made by tires having a "wavy" or "kinky" tread. However, there were no distinguishing marks or peculiarities in or about the tracks to indicate that they were made by any particular truck having tires of the general kind above mentioned. Some days thereafter, Cook saw respondent's truck in town and observed that it had Firestone tires, the treads of which were wavy, or kinky.

The principal witness for the state was the deputy sheriff, Wado Bush. His testimony may be summarized as follows: In response to Lavene Cook's telephone call on February 20th, Bush went at once to the Cook farm, and the two men made an inspection of the ground in the vicinity of the pole line. They discovered tire tracks, which Bush thought were made by a truck having Firestone tires, although he conceded that many makes of tires had a wavy tread, and ad-

mitted that he could not explain the difference between the tread of a Firestone tire and those of various other makes of tires. He also admitted that he could not tell whose truck, or what particular truck, had made the tracks which he observed during that inspection. Upon that same occasion, near the places where the poles had been pushed over, he observed a number of foot prints, of two different sizes. Some of these prints had the appearance of having been made by a "cowboy boot-type heel"; however, the heel prints had no distinguishing marks.

On March 3rd, which was about ten days after his investigation at the Cook premises, Bush called at the Gillingham ranch and had a talk with the respondent. During that conversation, Bush asked respondent whether he knew anything about the wire that had been taken from the Cook land, and respondent replied that he did not. Bush then stated that he had reason to believe that respondent's truck had been seen in the vicinity of the Cook farm on a recent night. In reply to this, respondent said: "Well, if my truck was down there, I didn't know anything about it." Bush then asked respondent whether he had ever sold any wire, and the latter replied that he never had. During this same conversation, Bush observed that respondent was wearing cowboy boots, and that respondent's truck, standing nearby, had Firestone tires with a wavy tread. The witness stated, however, that he would not be able to tell whether the heel prints which he had seen were made by the boots worn by respondent.

On September 19, 1948, which was seven months after the events above narrated, respondent was arrested upon a charge of grand larceny alleged to have been committed in the manner hereinbefore set forth. On the following day, while respondent was in custody, the deputy sheriff and the prosecuting attorney for Grant county questioned him regarding the alleged offense. Respondent denied all knowledge of the wire in question and disclaimed any connection with its removal. He did admit, however, that at about the time of the disappearance of the wire from the Cook farm,

he himself had sold to an electrical firm in Spokane about eight hundred pounds of wire, which he claimed came from his own farm. Then, after signing a written statement to the effect that this was the only copper wire that he had sold in Spokane for some time, he admitted upon further questioning on that same occasion that he might also have sold some wire to Alaska Junk Company in Spokane.

By the testimony of Charles Sanders, internal auditor for Alaska Junk Company of Spokane, it was shown that on February 18, 1948, respondent had delivered and sold to the junk company 1011 pounds of No. 1 copper wire, and was paid therefor, by check made out to him, the sum of $141.54. The witness explained that No. 1 copper wire came in fifteen different sizes ranging from size 14, which is the smallest, to size 00, which is the largest. He further explained that Alaska Junk Company usually purchased approximately 300,000 pounds of wire a year, of which about 40% was No. 1 wire. These purchases, he said, were made from anyone who had wire to sell, including farmers, industrial plants, and other persons. When wire is brought in to the company and purchased by it, the various lots thereof are not kept separate, but are thrown together in one group pile and held for thirty days before shipment for resale. The witness further testified that, although the records of his company showed that the wire purchased from respondent was of the No. 1 classification, they did not show the size of the wire; further, that this particular lot of wire had long since been reshipped and there was no way of determining what size it was.

By other witnesses testifying for the state, it was shown that the wire which formerly had been a part of the Cook power line was No. 1 classification, size six.

It was upon this evidence, as summarized above, that the trial court directed the jury to return a verdict of not guilty.

It may well be that upon a casual reading of the evidence as we have heretofore outlined it, one could, and probably would, harbor some suspicion reflecting unfavorably upon the respondent, and that such suspicion might linger until respondent had explained how he came into lawful posses-

sion of the copper wire which admittedly he sold at about the same time that the wire here in question was taken from the Cook power line, and until he had also given some reason why on March 3rd he had denied that he had ever sold any copper wire at all.

█ It is to be remembered, however, that respondent was charged with a criminal offense, and that it was the burden of the state to prove, not by the creation of a mere suspicion, but by competent evidence, and beyond a reasonable doubt, that respondent was guilty of that offense. It is also to be remembered that, until the state has produced evidence of that character and weight, it is not incumbent on the accused person to produce any evidence whatever in support of his innocence.

It is apparent that the evidence as we have outlined it, and upon which the state relied for conviction, was purely circumstantial, as opposed to direct and positive evidence.

█ Circumstantial evidence, as that term is commonly understood in criminal law, means proof of such facts or circumstances connected with or surrounding the commission of the offense charged as tend to show the guilt or innocence of the accused. *People v. Morrow* (1882), 60 Cal. 142; *State v. Marren,* 17 Idaho 766, 107 Pac. 993; *State v. Farris,* 48 Idaho 439, 282 Pac. 489; *People v. Shapiro,* 371 Ill. 234, 20 N.E. (2d) 284; *State v. Shelton,* 223 Mo. 118, 122 S.W. 732; *State v. Riggs,* 61 Mont. 25, 201 Pac. 272; *Horn v. Territory,* 8 Okla. 52, 56 Pac. 846; *State v. Goettina,* 61 Wyo. 420, 158 P. (2d) 865.

█ It is a well established rule that, in order to sustain a conviction on circumstantial evidence, the circumstances proved by the state must not only be consistent with each other and consistent with the hypothesis that the accused is guilty, but also must be inconsistent with any hypothesis or theory which would establish, or tend to establish, his innocence. 23 C. J. S. 149, Criminal Law, § 907; 20 Am. Jur. 1069, Evidence, § 1217.

In *State v. Payne,* 6 Wash. 563, 34 Pac. 317, this court, in reversing a judgment of conviction for the crime of grand larceny, said:

"No man ought to be convicted of a crime upon mere suspicion, or because he may have had an opportunity to commit it, or even because of bad character, and where circumstances are relied on for a conviction they ought to be of such a character as to negative every reasonable hypothesis except that of the defendant's guilt. And a new trial should be granted where a conviction is had on evidence not connecting the defendant with the crime beyond a reasonable doubt. *Williams v. State,* 85 Ga. 535 (11 S.E. Rep. 859)."

The foregoing quotation was repeated with approval in *State v. Pienick,* 46 Wash. 522, 90 Pac. 645, 11 L.R.A. (N.S.) 987. The *Pienick* case also quoted approvingly the following paragraph from *State v. Morney,* 196 Mo. 43, 93 S.W. 1117:

"Where a chain of circumstances leads up to and establishes a state of facts inconsistent with any theory other than the guilt of the accused, such evidence is entitled to as much weight as any other kind of evidence, but the chain, as it were, must be unbroken, and the facts and circumstances disclosed and relied upon must be irreconcilable with the innocence of the accused in order to justify his conviction."

We are aware of the kindred rule, declared in *State v. Donckers,* 200 Wash. 45, 93 P. (2d) 355, to the effect that the question whether circumstantial evidence tending to connect the accused with the crime charged excludes, to a moral certainty, every other reasonable hypothesis than that of guilt, is a question for the jury, and not for the court. That rule, however, is applicable only when the evidence, although circumstantial, is legally sufficient to take the case to the jury. It does not apply where the court can say, as a matter of law, that the evidence adduced by the state will not support a verdict of guilty.

Examining the evidence in the light of these rules and principles, we are convinced that it was insufficient to warrant a verdict of guilty in this case. We advert briefly to its deficiencies: If the truck which Lavene Cook saw on the highway in front of his house on February 17, 1948, was that of the respondent, there is no evidence that re-

spondent was in or near it at the time. There is no evidence that the truck, when seen, was engaged in any unlawful activity. There is no evidence which established that it was respondent's truck, and none other, that was used to push over the poles on the Cook farm at the time the wire was stolen. Similarly, the evidence does not establish that the heel prints observed by Bush and Lavene Cook were made by boots worn by respondent, and not by some other person. There is no evidence, other than what has just been referred to, tending to prove that respondent was in the vicinity at the time the crime is alleged to have been committed. Most important of all, there is no evidence that the wire which respondent sold to Alaska Junk Company, or any part thereof, was the wire which was stolen from Cook, nor even that the wire which was thus sold was the same size as that which had been stolen. In other words, the wire which respondent sold to the junk company was never identified as being that which was missing from the Cook farm. The case thus presents a situation of failure of proof on the part of the state.

Until the wire which respondent sold was identified as belonging to Cook, its possession by respondent did not call for any explanation whatever by him. In the case of *State v. Payne, supra,* involving the theft of a twenty-dollar gold piece and some smaller coins, this court, with a similar problem before it, said, at page 574:

"If it was incumbent upon the appellant to explain his possession of the twenty dollars, which is not shown ever to have been the property of Cox [the complaining witness], we think his explanation was a reasonable one. But until the coin had been identified as the property of Cox, its possession called for no explanation whatever. It is the possession of property *shown to have been stolen* that raises a presumption of guilt on the part of the possessor, not the possession of like property merely, and such presumption [flowing from possession of property shown to have been stolen] is destroyed whenever a reasonable explanation is given and is not shown to be untrue."

Near the conclusion of its opinion in the *Payne* case, *supra,* this court said further:

"While we are loth to disturb the verdict of a jury on the ground of insufficiency of the evidence to justify the verdict, yet where the evidence as disclosed by the record is palpably insufficient to warrant the verdict, as we deem it to be in this case, it is our duty to say so and to award a new trial."

So, here, although any court would be loth to interfere with the unquestioned right of the jury to determine the weight of the evidence, direct or circumstantial, yet where the evidence disclosed by the record is, when taken in its entirety, clearly insufficient to warrant a verdict of guilty, it would be the duty of the court to say so, and to direct the jury to return a verdict of not guilty, as the trial court did in this instance.

Upon the evidence admitted at the trial, we think the trial court was correct in disposing of the case by granting respondent's motion for a directed verdict in his favor.

■   As indicated above, appellant also assigns error upon the refusal of the trial court to admit certain evidence offered by the state in its effort to identify the respondent as the perpetrator of the crime charged.

The state offered to prove by two witnesses that, within a day or two after the wire was missing from the Cook farm, other wire was taken from an unused line belonging to Grant county public utility district No. 2, the wire being located on premises adjacent to the farm which respondent operated; that the wire belonging to the public utility district was taken without permission of the owner and in the same manner as was that which was removed from the Cook place; and that the total amount of wire taken from the two places equalled approximately the amount which respondent sold to Alaska Junk Company.

Assuming the admissibility of this evidence, and further assuming its proof as offered, we are satisfied that it would have added but another weak link to an already weakened chain of circumstances. This new link has as many, and perhaps more, of the weaknesses which we deemed fatal to the state's case in our consideration of the evidence actually admitted. This additional evidence, sought by the state

to be introduced, sheds no added light upon the matter of identification of the wire stolen from the Cook property, or upon the identity of the person who may have stolen it, and it certainly is no further proof of possession of such wire by the respondent. The admission of this evidence, and its consideration in light of the other evidence, would not affect our previously expressed conclusions in this case. If, however, the refusal of the court to admit the offered evidence be considered as error, we do not deem it reversible error in this case.

The judgment is affirmed.

JEFFERS, C. J., BEALS, MALLERY, and HILL, JJ., concur.

[1] Reported in 207 P. (2d) 716.