[No. 34663. Department Two. November 28, 1958.]

FLORENCE M. BECK, *Appellant*, v. THE DEPARTMENT OF
LABOR AND INDUSTRIES, *Respondent*.[1]

*Zabel & Poth* and *Grovenor Anschell*, for appellant.

*The Attorney General* and *Fred R. Butterworth, Assistant*, for respondent.

DONWORTH, J.—John T. Beck, aged 55, died May 28, 1953, as a result of an intracranial hemorrhage caused by the rupture of the wall of an artery located near the base of his brain.

On March 10, 1954, appellant, Mr. Beck's widow, filed a claim for a pension under the workmen's compensation act (RCW Title 51), in which she averred that on April 6, 1953,

[1]Reported in 332 P. (2d) 54.

while in the employ of Elliott Bay mill, Seattle, Mr. Beck sustained an industrial injury which ultimately resulted in his death.

The supervisor of industrial insurance entered an order on May 6, 1954, rejecting appellant's claim on the grounds that the departmental investigation had

". . . failed to reveal any evidence that the deceased had been injured at the time and place set forth in the application and the evidence having also disclosed that death was due to causes which were unrelated to the injury alleged . . ."

Appellant appealed to the board of industrial insurance appeals. As a witness on her own behalf before the board's trial examiner, appellant related the events which transpired on April 6th and up until the time the deceased was stricken on the evening of April 7, 1953, substantially as follows:

Mr. Beck returned home from work about four o'clock in the afternoon of April 6th. At that time "he didn't complain, he just seemed kind of quiet." Appellant did not notice anything in his demeanor or actions different than before he had gone to work that morning. Later in the evening, Mr. Beck remained quiet and appellant thought that he was tired. The following morning, Mr. Beck arose as usual and went to work. Appellant, not paying particular attention to him, failed to notice anything unusual about his appearance at that time. About four o'clock in the afternoon, Mr. Beck returned to his home from work. He then seemed to be more quiet than usual. After watching television later that evening, Mr. Beck suddenly arose and grasped his head. He appeared ashen-colored; very pale. He looked to be in great pain. Appellant telephoned a physician, who prescribed medication. After an uncomfortable night, during which he was continuously ill, Mr. Beck was taken to a hospital for treatment. About two weeks later, he returned to his home and remained there for about two weeks. A hemorrhage then recurred, which necessitated his returning to the hospital, where he received treatment until the time of his death.

At the board hearing, appellant was asked by her counsel

concerning certain statements made to her by Mr. Beck at the time he was stricken on April 7th regarding an alleged accident occurring at the mill on the preceding day. Respondent's objection to this testimony, on the ground that it was hearsay, was sustained by the trial examiner. Thereupon, appellant offered to prove, by her own testimony, that:

". . . on April 7, 1953, in the evening, that her husband, Mr. Beck, told her that he had had an awful bump on the back of his head on a beam in the Elliott Bay Mill while he was working on April 6, 1953, and that he since that time —since the blow, he had sustained headaches and that they seemed to be getting worse at that time, and that he received a blow on his head while he was in the course of employment, working on that date of April 6, 1953."

Upon stipulation of counsel, the autopsy report of Dr. George Tooley was read into the board record. This report concludes as follows:

"FINAL DIAGNOSIS: Primary cause of death: *Spontaneous* subarachnoid hemorrhage due to rupture of small aneurysm of the Circle of Willis. Other findings: 1. Marked pulmonary congestion and edema. 2. Terminal bronchopneumonia. 3. Marked passive congestion of viscera." (Italics ours.)

Dr. Hunter MacKay, a neurosurgeon, who had never seen the deceased in his lifetime, was called by appellant to testify as an expert witness. There was no other medical expert called as a witness. Concerning the condition which led to the death of the deceased, Dr. MacKay testified:

"Most of these aneurysms are of what is known as congenital origin. In other words, at a juncture or branching of blood vessels at the base of the brain, where these usually occur, there is a defect in the muscle of the vessel wall, so that with time gradually expands, so that the majority of them are congenital, in other words, something that they are born with fundamentally, and over a period of time this gradually develops. . . .

"From the medical standpoint, it is well known that *most aneurysms*, either found on autopsy or patient expires for some other reason, *rupture spontaneously without the advent of the injury.* . . ." (Italics ours.)

Appellant propounded a hypothetical question to Dr. MacKay in which he was asked to assume, among other things,

". . . that this man having been at work and having returned home from work complained to his wife that he had sustained an injury while at work which was caused by his having reared up underneath a beam at the mill and which had caused him to strike his head on the beam, . . ."

The witness responded, in part, as follows:

". . . The fact of this question, where this aneurysm is found to exist at autopsy, in relation to the injury, in relation to the time at which the symptoms began, puts me in a position where I have got to say that in my opinion the injury cannot be divorced as the causative factor of the ruptured aneurysm."

Dr. MacKay further testified in response to questions asked by the board's trial examiner:

"Q. Doctor, is this one of the sort of things that is invariably caused by trauma or—? A. You mean the aneurysm? Q. Rupture of aneurysm? A. No. Most of these are spontaneously ruptured in many young persons, type of people you read about in the newspaper, or somebody on the way to work, suddenly drop dead of cerebral hemorrhage. That is what's happened. Q. Doctor, would it make any difference to you where this blow, assuming there was a blow, occurred, that is, what part of the head? A. No. Q. Would the intensity of the blow make any difference? A. No."

At the conclusion of the claimant's evidence, the employer and respondent moved to dismiss the appeal on the ground the petitioner had failed to establish a *prima facie* case. The motion was taken under advisement by the trial examiner for submission before the board of industrial insurance appeals.

In its decision and order sustaining the order of the supervisor of industrial insurance, rejecting appellant's application for a widow's pension, the board ably summarized the evidence, concluded that the proffered testimony of appellant was inadmissible in evidence, and further concluded that:

" . . . even if the petitioner had established that her deceased husband had bumped his head on a beam while at work on April 6, the medical evidence presented is insufficient to prove the probability of a causal relationship between that incident and his subsequent death."

On the basis of the evidence introduced before it, the board found, in part:

"The deceased workman, John T. Beck, did not sustain an industrial injury on April 6, 1953, while in the employ of Elliott Bay Mill Company at Seattle, Washington.

"The deceased workman's death was caused by a spontaneous subarachnoid hemorrhage occasioned by the rupture of a small aneurysm of the Circle of Willis, which was due to natural causes and unrelated to his employment with the Elliott Bay Mill Company."

From the order of the board sustaining the supervisor of industrial insurance, appellant appealed to the superior court. The department appeared through the attorney general and moved to dismiss the appeal on the ground that:

" . . . the certified appeal board record herein contains insufficient properly admissible evidence to make a *prima facie* case to justify the submission of the cause to a jury."

Pursuant to hearing upon this motion, the trial judge entered an order dismissing appellant's appeal with prejudice on the ground asserted by the department. This appeal ensued.

Appellant first contends that the trial court

" . . . erred in failing to remand the case to the Board of Industrial Insurance Appeals for further evidence where such evidence had been improperly excluded."

Concerning this assignment of error, it is argued that the trial examiner should have permitted appellant to testify concerning the statements allegedly made to her by the deceased on April 7th (as set forth in appellant's offer of proof).

There is an apparent conflict in the decisions of this court upon the admissibility and effect of hearsay evidence

in workmen's compensation cases. Appellant relies upon our decisions in *Seattle-Tacoma Shipbuilding Co. v. Department of Labor & Industries,* 26 Wn. (2d) 233, 173 P. (2d) 786 (1946); *Guiles v. Department of Labor & Industries,* 13 Wn. (2d) 605, 126 P. (2d) 195 (1942); *Devlin v. Department of Labor & Industries,* 194 Wash. 549, 78 P. (2d) 952 (1938), annotation in 163 A. L. R. 231; *Thomas v. Department of Labor & Industries,* 181 Wash. 683, 44 P. (2d) 765 (1935), and *McKinnie v. Department of Labor & Industries,* 179 Wash. 245, 37 P. (2d) 218 (1934). On the other hand, respondent relies upon *Hutchings v. Department of Labor & Industries,* 24 Wn. (2d) 711, 167 P. (2d) 444 (1946), a departmental decision of this court, decided seven months prior to our unanimous *en banc* decision in *Seattle-Tacoma Shipbuilding Co., supra,* which purported to expressly overrule the *Devlin* and *McKinnie* cases, *supra,* at least in so far as they were inconsistent with the rule announced in *Hutchings.* Other prior cases seemingly supporting respondent's position are *Brown v. Department of Labor & Industries,* 23 Wn. (2d) 572, 161 P. (2d) 533 (1945); *Wintermute v. Department of Labor & Industries,* 183 Wash. 169, 48 P. (2d) 627 (1935); *Sweitzer v. Department of Labor & Industries,* 177 Wash. 28, 30 P. (2d) 980, 34 P. (2d) 350 (1934).

We do not find it necessary to attempt to reconcile this apparent conflict in our decisions on this subject. For purposes of this case, we will assume that a traumatic event occurred (as appellant offered to prove) and that appellant's husband met with an industrial accident while in the course of his employment. We, therefore, pass to a consideration of the question of whether there was sufficient medical testimony to make a *prima facie* showing that the assumed trauma probably caused the condition which resulted in Mr. Beck's death.

Much of Dr. MacKay's testimony is quoted above. In addition thereto, he was asked, on cross-examination:

"Q. Doctor, your testimony with reference to causal relationship is wholly dependent upon the facts as contained in the hypothetical question; is that true? A. Yes."

He further testified as follows:

" . . . Assuming that this injury happened, that this information is accurate, of the train of symptoms, I can't say that the injury didn't cause this, and in my opinion I would have to say that I think the injury would have caused the rupture of this aneurysm."

As pointed out by the board in its decision:

" . . . it is noted that there is a clear inference in the hypothetical question that Mr. Beck complained of headache and pain in his head on returning home the day of the alleged injury. There not only is no evidence to support such an assumption, but the petitioner's testimony is directly to the contrary, that is, that her husband had no complaints when he came home on the day of his alleged injury. The importance of the assumption that the deceased's headache symptoms began immediately following his assumed injury is apparent from Dr. MacKay's answer to the hypothetical question."

■ In *Berndt v. Department of Labor & Industries,* 44 Wn. (2d) 138, 265 P. (2d) 1037 (1954), we said:

" . . . when an expert who knows nothing about an individual except what is included in a hypothetical question assumes, as the basis for his opinion, the existence of certain conditions not included in that question and not necessarily inferable therefrom, and not established by the evidence, he destroys the validity of his answer. . . ."

See, also, *Weissman v. Department of Labor & Industries,* 52 Wn. (2d) 477, 326 P. (2d) 743 (1958).

■ In the present case, Dr. MacKay was asked to assume facts (symptoms) which were controverted by the only evidence on the subject, *i.e.,* the testimony of appellant. The answers of Dr. MacKay, based upon this defective hypothetical question, were valueless as evidence.

■ Our review of this record convinces us that the trial court did not err in holding the evidence to be insufficient to present a *prima facie* case for the consideration of the jury.

The judgment is, therefore, affirmed.

HILL, C. J., WEAVER, ROSELLINI and FOSTER, JJ., concur.