[No. 39671. En Banc. January 25, 1968.]

THE STATE OF WASHINGTON, *Respondent,* v. DOUGLAS E. LYNN, *Appellant.**

*David W. Soukup* and *Irving C. Paul, Jr.,* for appellant (appointed counsel for appeal).

*Charles O. Carroll* and *Robert E. Dixon,* for respondent.

HILL, J.—Douglas E. Lynn appeals from a conviction of second-degree murder, urging that the evidence is insufficient to sustain the conviction and that, in any event, trial errors entitle him to a new trial.

The information charged Lynn with the killing of Brian Leach, a 5-year-old child, alleging that it occurred in the commission of a felony, *i.e.,* an assault in the second degree; and that Kathleen S. Leach, the mother of the child, aided and abetted in the assault.

The jury returned a verdict of guilty against both defendants. Mrs. Leach was given a deferred sentence, and

*Reported in 436 P.2d 463.

has not appealed. A supplemental information was filed against Lynn alleging a 1959 conviction for taking and riding in an automobile without the permission of the owner; and a 1961 conviction for burglary. He was adjudged to be an habitual criminal and sentenced to life imprisonment. The second-degree murder conviction, with which we are concerned, must be upheld to sustain the adjudication that the appellant is an habitual criminal.

The evidence establishes that the appellant and his codefendant, Kathleen Leach, had been living together for about a year, and during the last several months before January, 1967, were the only ones who had had custody of the child.

On the afternoon of January 4, 1967, according to a statement (attributed to the appellant by his sister), Brian Leach fell from a chair where he had been required to sit by the appellant as a punishment, and the child was unconscious when he was picked up. Mrs. Leach was out shopping at the time. When she returned she took the still unconscious boy to the Ballard Hospital. Dr. Martin G. Burkland, who examined the child there, testified that from the seizures the child was having he believed there had been a head injury and that neurosurgery was needed immediately. He had the child transferred by ambulance to the University Hospital, where neurosurgical specialists confirmed Dr. Burkland's general diagnosis by finding that Brian had sustained a subdural hematoma.[1]

Despite all that modern medicine and surgery could do, Brian died on January 10. The cause of the death was "hematoma and brain injury."

It is established by the testimony of the various doctors that on January 4, there were many bruises on Brian's body and two open sores on his buttocks. Examination also disclosed two fractured ribs.

---

[1] A tumor or swelling of tissue caused by a collection of clotted blood within the tissue, located between the two outermost membranes (dura mater and arachnoid) of the three membranes surrounding the brain.

There was unanimity that the subdural hematoma was caused by a blow on the head and that the time when the blow was sustained might have been 2 weeks prior to the time he was examined on January 4; and that it might have been the day before, but not that day. (The information charged that second-degree assault occurred between December 20, 1966 and January 5, 1967.)

That Brian was a badly battered child was obvious. The appellant urges, however, that there is no evidence that he committed second-degree assault on the child, or that any assault caused the subdural hematoma that resulted in death.

The state points out that the appellant and Mrs. Leach had custody of the child for some time prior to January 4; that when Mrs. Leach found the child unconscious on that day she insisted on getting him to a hospital, while appellant expressed concern only that he not be implicated; that when the officers sought to arrest him, he was found hiding behind a bathroom door armed with a knife, and there was some evidence that he attempted to run away from the officers.

Dr. Gale Wilson, chief pathologist for the King County Coroner, performed the autopsy. His testimony was that the head injury was not the type that would be sustained in a normal fall; and he testified that the head must have been in motion when it hit the object that caused the injury.

The foregoing is the strongest case that can be made for the state, and it is not strong enough. This seems to be a situation in which the Scotch verdict of "Not Proven" would be appropriate.

 This is a felony assault-murder case. We have considered the reason for our felony assault-murder rule in *State v. Harris,* 69 Wn.2d 928, 421 P.2d 662 (1966). The state, in this case, has to prove a second-degree assault[2] by

---

[2]RCW 9.11.020 defines second-degree assault:

"Every person who, under circumstances not amounting to assault in the first degree—

". . .

the appellant on Brian Leach, and that death occurred in consequence of that assault.

The evidence established that the child had been beaten about the body; it also established that he died of a brain injury. It also made clear that the injuries on the body (the bruises, the open sores, the rib fractures) did not in any way contribute to the boy's death. It did not establish that the fatal brain injury resulted from a beating. Each of the neurosurgical specialists who treated Brian at the University Hospital agreed that the blow on the head which caused the subdural hematoma and the consequent brain injury, could have resulted from a fall, or from running against a solid object.

Dr. Gale Wilson, the autopsy surgeon, testified that the fatal head injury was not caused by someone striking the boy with some object, but was rather caused by the head being in motion and striking a solid object. While this would be consistent with a fall or running into a solid object, Dr. Wilson said that it was not the type of an injury usually resulting from a fall.

Confronted with a complete hiatus in proof of a second-degree assault, or any assault that could be connected with the subdural hematoma, the state resorted to trying to prove its case by the totality of the circumstances.

The state asked a question of each doctor, in substance as follows:

> Taking into consideration the total medical picture of this boy as you saw him and considering all the injuries together, were they consistent with a beating?

An affirmative response to that question was secured from each of the doctors, the response of Dr. Ojemann being that they "were not incompatible" with a beating.

Then followed a further question:

> Again taking into consideration the total medical pic-

---

"(3) Shall wilfully inflict grievous bodily harm upon another with or without a weapon; or

". . .

"Shall be guilty of assault in the second degree and be punished . . ."

ture, are the circumstances consistent with any other type of injury or any other manner in which these injuries were sustained?

Two doctors gave a negative response. However, Dr. Wilson did not answer the question as thus framed by the state, but stated that the injuries were of two classes: some that could only be caused by a beating; others, including the fatal injury, that could only have been caused by a fall or series of falls.

Thus, disregarding all the evidence which does not fit the state's theory, we have the doctor's testimony that the injury was consistent with a beating, and that it was not consistent with any other circumstance.

Whatever probative value such generalizations may have had is nullified by the testimony of each doctor that none of the other injuries apparent on Brian's body had any relation to the fatal subdural hematoma; and that these other injuries were not sustained at the same time as the head injury which caused the subdural hematoma. Dr. Ojemann testified that the head injury could have been caused as much as a week before any other injury. Dr. Stuntz testified that it was not only possible, but a "probability" that the head injury was present before the other injuries.

As to the cause of the head injury, Dr. Stuntz said it could have been caused by anything, *e.g.*, a child playing, tripping and striking a solid object.

To summarize: each doctor testified that the head injury could not be related to the other injuries, and that the fatal head injury could have been caused by a fall.

■ The responses of the doctors to questions based upon the erroneous assumption that the unrelated injuries could be considered together, which responses were explicitly contradicted by other testimony of each of the doctors are of no probative value in connecting the fatal injury with a beating by the appellant. *Hagen v. Seattle,* 54 Wn.2d 218, 339 P.2d 79 (1959); *Beck v. Department of Labor & Indus.,* 53 Wn.2d 189, 332 P.2d 54 (1958).

■ There simply is no evidence of any assault that caused death. Concededly, the appellant could have hit the

child in the head; so might Mrs. Leach or any other person who was with the child in the 2 weeks prior to January 4, 1967. The child might also have ridden a broom-stick horse full tilt into a wall or a piece of furniture, or sustained a fall while playing. We do not send people to the penitentiary on such speculation and conjecture. The circumstances proved by the state must not only be consistent with the guilt of the accused, but must also be inconsistent with any reasonable hypothesis or theory which would tend to establish his innocence. *State v. Courville*, 63 Wn.2d 498, 387 P.2d 938 (1963); *State v. Gillingham*, 33 Wn.2d 847, 207 P.2d 737 (1949).

It is difficult to be objective about the death of a child particularly under the present circumstances. Those responsible ought to be punished. Nevertheless, there must be proof as to who, if anyone, inflicted the injuries that resulted in death. As we said in *State v. Guiles*, 53 Wn.2d 386, 333 P.2d 923 (1959), a somewhat similar case:

> Reprehensible and repulsive as the conduct of the defendant is, nevertheless, it is not proof of manslaughter.

Neither is the conduct of the appellant here proof of second-degree murder. Our conclusion that the state failed to prove its case finds support in cases such as *State v. Guiles, supra; State v. Gillingham, supra; State v. Payne*, 6 Wash. 563, 34 Pac. 317 (1893); *Bluth v. State*, 38 Ala. App. 692, 92 So.2d 685 (1957); *Osbon v. State*, 213 Ind. 413, 13 N.E.2d 223 (1938); *State v. Bynum*, 69 Ohio App. 317, 43 N.E.2d 636 (1942); *Rucker v. State*, 174 Tenn. 569, 129 S.W.2d 208 (1939); *State v. Rounds*, 104 Vt. 442, 160 Atl. 249 (1932).

The conviction of the appellant is set aside, as is the adjudication that he is an habitual criminal. The case is remanded to the Superior Court for King County with instructions to grant the motion to dismiss the charge of second-degree murder against the appellant, the evidence being insufficient to sustain the conviction.

FINLEY, C. J., WEAVER, ROSELLINI, HUNTER, HAMILTON, HALE, and NEILL, JJ., concur.