Jeffrey T. OXENDINE, Sr., Defendant
Below, Appellant,

v.

STATE of Delaware, Plaintiff
Below, Appellee.

Supreme Court of Delaware.

Submitted: Oct. 15, 1986.
Decided: June 29, 1987.

Peter N. Letang, Asst. Public Defender (argued), Wilmington, for appellant.

Loren C. Meyers, Deputy Atty. Gen. (argued), and Richard E. Fairbanks, Jr., Chief of Appeals Div., Dept. of Justice, Wilmington, for appellee.

Before HORSEY, MOORE, and WALSH, JJ.

HORSEY, Justice:

Defendant, Jeffrey Oxendine, Sr., appeals his conviction in trial by jury in Superior Court of manslaughter (11 *Del.C.* § 632(1)) [1] in the beating death of his six-year-old son, Jeffrey Oxendine, Jr. Oxen-

---

1. 11 *Del.C.* § 632(1) states:
"A person is guilty of manslaughter when: (1) He recklessly causes the death of another person."

dine was sentenced to twelve years' imprisonment.[2] On appeal, Oxendine's principal argument is that the Trial Court committed reversible error by denying his motion for a judgment of acquittal on the issue of causation. Specifically, he argues that the State's medical testimony, relating to which of the codefendants' admittedly repeated beatings of the child was the cause of death, was so vague and uncertain as to preclude his conviction of any criminal offense.

We conclude that the evidence upon causation was insufficient to sustain Oxendine's conviction of manslaughter, but that the evidence was sufficient to sustain his conviction of the lesser included offense of assault in the second degree (11 *Del.C.* § 612(1)).[3] Therefore, we affirm the Trial Court's denial of Oxendine's motion for a judgment of acquittal, direct that he be convicted of assault in the second degree, and remand for entry of judgment of conviction and resentencing for that offense.

\* \* \*

The facts may be summarized as follows: On the morning of January 18, 1984, Leotha Tyree, Oxendine's girlfriend, who lived with him, pushed Jeffrey into the bathtub causing microscopic tears in his intestines which led to peritonitis. During a break at work that evening, Oxendine telephoned home and talked to Jeffrey, who complained of stomach pains. When Oxendine returned home from work, he saw bruises on Jeffrey and knew that Tyree had beaten the child during the day. Although Jeffrey continued to complain of a stomachache, he apparently did not tell his father how or when he received the bruises.

The next morning at approximately 7:30 a.m., Oxendine went into Jeffrey's bedroom and began screaming at him to get up. A neighbor in the same apartment building testified to hearing sounds coming from the room of blows being struck, obscenities uttered by a male voice, and cries from a child saying, "Please stop, Daddy, it hurts." After hearing these sounds continue for what seemed like five to ten minutes, the witness heard a final noise consisting of a loud thump, as if someone had been kicked or punched "with a great blow."

Later that day, Jeffrey's abdomen became swollen. When Oxendine arrived home from work at about 5:00 p.m., Tyree told him of Jeffrey's condition and urged him to take Jeffrey to the hospital. Oxendine, apparently believing that Jeffrey was exaggerating his discomfort, went out, bought a newspaper, and returned home to read it. Upon his return, Tyree had prepared to take Jeffrey to the hospital. En route, Jeffrey stopped breathing; and was pronounced dead shortly after his arrival at the hospital.

I

In order to convict Oxendine of manslaughter, the State had to show that his conduct caused Jeffrey's death. 11 *Del.C.* § 261 defines causation as the "antecedent but for which the result in question would not have occurred." 11 *Del.C.* § 261. At trial, the State's original theories of causation were, alternatively, (1) a "combined direct effect," or (2) an "aggravation" theory.

During its case-in-chief, the State called medical examiners Dr. Inguito and Dr. Hameli, who both testified that Jeffrey's death was caused by intra-abdominal hemorrhage and acute peritonitis, occurring as a result of blunt force trauma to the front of the abdomen. Similarly, each pathologist identified two distinct injuries, one caused more than twenty-four hours before death, and one inflicted less than twenty-four hours before death.

---

**2.** Codefendant, Leotha Tyree, was also convicted in the same trial of manslaughter in the death of Jeffrey Oxendine, Jr. and was sentenced to nine years' imprisonment. On direct appeal, this Court has affirmed her conviction. *Tyree v. State,* Del.Supr., 510 A.2d 222 (1986) (Order).

**3.** 11 *Del.C.* § 612(1) states:
"A person is guilty of assault in the second degree when: (1) He intentionally causes serious physical injury to another person."
Assault in the Second Degree is a Class C felony for which the range of punishment is 2 to 20 years.

Dr. Inguito could not separate the effects of the two injuries. In his view, it was possible that both the older and more recent hemorrhage could have contributed to the death of the child, but he was unable to tell which of the hemorrhages caused the death of the child. Dr. Inguito could not place any quantitative value on either of the hemorrhages nor could he state whether the fresh hemorrhage or the older hemorrhage caused the death. The prosecutor never asked, nor did Dr. Inguito give, an opinion on whether the second hemorrhage accelerated Jeffrey's death.

Dr. Hameli, on the other hand, was of the opinion that the earlier injury was the underlying cause of death. According to him, the later injury, *i.e.*, the second hemorrhage, "was an aggravating, and probably some factors [sic] contributing," but it was the earlier injury that was the plain underlying cause of death.

The prosecutor, however, did explicitly ask Dr. Hameli if the second injury accelerated Jeffrey's death. The relevant portion of the testimony is as follows:

**Prosecutor:** Dr. Hameli, within a reasonable degree of medical certainty and in your expert opinion, did the second hemorrhage accelerate this child's death?

**Hameli:** I do not know. If you are talking about timewise—I assume that's what you are talking about, exploration.

**Prosecutor:** You cannot give an opinion of that area; is that correct?

**Hameli:** No.

Oxendine moved for judgment of acquittal at the end of the State's case-in-chief. The Trial Court, however, denied his motion.

As part of her case, codefendant Tyree called Dr. Hofman, a medical examiner, who disagreed about the number of injuries. He perceived only one injury inflicted about twelve hours before death. Subsequently, the prosecutor asked Hofman the following hypothetical question that assumed two blows when Hofman only testified as to one blow:

**Prosecutor:** In your expert medical opinion within a reasonable degree of medical certainty, if this child, given his weakened state as a result of the significant trauma to his abdominal cavity, suffered subsequently another blunt force trauma to the same area, would it accelerate this child's death?

\* \* \* \* \* \*

**Hofman:** My opinion, as in a general statement, not knowing this child, it certainly would have an impact on shortening this child's life.

**Prosecutor:** Is then, therefore, your answer yes?

**Hofman:** Yes.

At the end of trial, Oxendine again moved for judgment of acquittal. The Trial Court denied the motion and instructed the jury on the elements of recklessness, causation and on various lesser included offenses. The ultimate and only theory of causation on which the jury was charged was based on "acceleration." The Trial Court instructed the jury that "[a] defendant who causes the death of another ... is not relieved of responsibility for causing the death if another later injury accelerates, that is, hastens the death of the other person. Contribution without acceleration is not sufficient." As previously noted, the jury returned verdicts of manslaughter against Oxendine and Tyree.

II

■ In this case, the evidence established that Oxendine inflicted a nonlethal injury upon Jeffrey after his son had, twenty-four hours earlier, sustained a lethal injury from a previous beating inflicted by Tyree. Thus, for Oxendine to be convicted of manslaughter in this factual context, the State was required to show for purposes of causation under 11 *Del.C.* § 261 that Oxendine's conduct hastened or accelerated the child's death. The Superior Court correctly

instructed the jury that "[c]ontribution [or aggravation] without acceleration is insufficient to establish causation." We do not equate aggravation with acceleration. It is possible to make the victim's pain more intense, *i.e.*, aggravate the injury, without accelerating the time of the victim's death. Thus, in terms of section 261, and as applied to defendant, the relevant inquiry is: but for his infliction of the second injury, would the victim have died when he died? If the second injury caused his son to die *any* sooner, then defendant, who inflicted the second injury, would be deemed to have caused his son's death within the definition of section 261.

■ A finding of medical causation may not be based on speculation or conjecture. *Riegel v. Aastad*, Del.Supr., 272 A.2d 715, 718 (1970). *See also Healy v. White*, Conn.Supr., 173 Conn. 438, 378 A.2d 540 (1977); *Gradel v. Inouye*, Pa.Supr., 491 Pa. 534, 421 A.2d 674 (1980); *Evans v. Liguori*, R.I.Supr., 118 R.I. 389, 374 A.2d 774 (1977). A doctor's testimony that a certain thing is possible is no evidence at all. *Palace Bar, Inc. v. Fearnot*, Ind. Supr., 269 Ind. 405, 381 N.E.2d 858, 864 (1978). His opinion as to what is possible is no more valid than the jury's own speculation as to what is or is not possible. *Id.* Almost anything is possible, and it is improper to allow a jury to consider and base a verdict upon a "possible" cause of death. *Id.* Therefore, a doctor's testimony can only be considered evidence when his conclusions are based on reasonable medical certainty that a fact is true or untrue. *Id.*

■ The State's expert medical testimony, even when viewed in the light most favorable to the State, was (1) insufficient to sustain the State's original theories of causation (a "combined direct effect" or an "aggravation" theory); and (2) insufficient to sustain the State's ultimate theory of causation ("acceleration") on which the court instructed the jury. Both of the State's expert witnesses, Dr. Inguito and Dr. Hameli, were unable to state with any degree of medical certainty that the second

injury contributed to the death of the child. Dr. Inguito could only testify that it was possible that both the older and more recent hemorrhage could have contributed to the death of the child. As for Dr. Hameli, he testified that the second injury independent of the first injury could have caused death but probably would not cause death. Furthermore, Dr. Hameli explicitly stated that he could not give an opinion as to whether the second injury accelerated Jeffrey's death. Similarly, Dr. Inguito was neither asked nor did he offer an opinion about acceleration.

■ The record establishes that the only theory of causation under which the State submitted the case to the jury was the acceleration theory. The State apparently abandoned its initial theories of causation and adopted the acceleration theory as the cause of death, based on the testimony of Dr. Hofman, a witness for codefendant Tyree, recalled by the State on rebuttal. That was too late to sustain the State's case-in-chief for manslaughter.

The State concedes that when it closed its case-in-chief it did not have a prima facie case to support acceleration. Therefore, even though the State could, based on Dr. Hofman's testimony, establish a prima facie case of acceleration at the end of the trial, Oxendine's conviction of manslaughter must be set aside for insufficiency of the evidence to establish that his conduct accelerated Jeffrey's death.

Furthermore, even if the State's evidence was sufficient to sustain its original theories of causation, we could not affirm Oxendine's conviction because the jury was not instructed on either of these theories. Although the State may submit alternate theories of causation to the jury, if supported by the evidence, it must establish in its case-in-chief a prima facie basis for each theory that goes to the jury.[4] In this case, the State did not maintain alternate theories throughout the trial. The State abandoned and completely changed its section 261 theories of causation after it closed its

4. This practice is often employed in murder cases when the State is unsure as to what type

of murder, *i.e.*, intentional, second degree, felony murder, etc., has taken place.

case-in-chief. The ultimate and only theory ("acceleration") on which the court instructed the jury was different and not compatible with the State's original theories of causation that it attempted to establish during its case-in-chief. As previously noted, acceleration is not synonymous with either aggravation or the combined effects of two injuries. Thus, when the State was unable to establish at the end of its case-in-chief a prima facie case for acceleration, its case for manslaughter failed.

It is extremely "difficult to be objective about the death of a child.... Those responsible ought to be punished. Nevertheless, there must be proof as to who, if anyone, inflicted the injuries that resulted in death." *State v. Lynn*, Wash.Supr., 73 Wash.2d 117, 436 P.2d 463, 466 (1968) (en banc). "Reprehensible and repulsive as the conduct of the defendant is, nevertheless it is not proof of manslaughter." *State v. Guiles*, Wash.Supr., 53 Wash.2d 386, 333 P.2d 923, 924 (1959).

The Trial Court, however, properly denied Oxendine's motion for judgment of acquittal at the close of the State's case because its medical testimony was sufficient for a rational trier of fact to conclude beyond a reasonable doubt that Oxendine was guilty of the lesser included offense of assault in the second degree, 11 *Del.C.* § 612(1). Therefore, we reverse Oxendine's conviction of manslaughter and remand the case to Superior Court for entry of a judgment of conviction and resentence of defendant for the lesser included offense of assault in the second degree.

\* \* \*

REVERSED AND REMANDED.