Raymond DEMBY a/k/a Raheen Love, Defendant Below, Appellant,

v.

STATE of Delaware, Plaintiff Below, Appellee.

No. 249, 1996.

Supreme Court of Delaware.

Submitted: May 8, 1997.
Decided: June 27, 1997.

Sandra W. Dean, Assistant Public Defender, Office of the Public Defender, Dover, for Appellant.

John Williams, Deputy Attorney General, Department of Justice, Dover, for Appellee.

Before VEASEY, C.J., WALSH, HOLLAND, HARTNETT, and BERGER, JJ., constituting the Court en Banc.

WALSH, Justice:

In this appeal from the Superior Court, we are required to determine whether the 1994 statutory enactments, which liberalized the State's obligation to establish the chain of custody in drug cases, impair a defendant's due process rights under the United States and Delaware constitutions. We conclude that the statutes in question, 10 *Del.C.* §§ 4331–32, although lessening the State's burden to authenticate evidence prior to admission, do not impair a defendant's due process rights. We further conclude that any inconsistency in the authenticity testimony presented by the State in this case affected the weight and not the admissibility of the evidence presented. Accordingly, we affirm the conviction.

I

The appellant, Brian Demby ("Demby") was convicted following a jury trial of possession with intent to deliver a controlled substance in violation of 16 *Del.C.* § 4751. We view the evidence underlying that conviction from a perspective supportive of the jury verdict.

On July 13, 1995, New Castle County Police Detectives Michael Smith ("Smith") and Christina Caruso ("Caruso") were working in tandem with the Dover Police Department investigating drug activity in that city, as part of an ongoing investigation into the street sale of drugs at open-air drug markets. The two officers, working undercover, occupied an unmarked police vehicle that was specially equipped with audio and video surveillance equipment. Smith was the driver of the vehicle and Caruso the passenger. Under the operation's protocol, the officers were attempting to purchase illegal drugs from street sellers while simultaneously recording the transactions.

At approximately 7:54 p.m. the undercover vehicle stopped on New Street, and Smith spoke to a person on the sidewalk who was later identified as Demby. Smith asked Demby if he had "a twenty," meaning a piece of cocaine. Demby said yes and asked Smith to throw $20 out of the window, stating that he, in turn, would throw the cocaine into the vehicle. When Smith refused to throw out the money, Demby instructed him to drive around the corner onto Reed Street. As the officers were pulling around the corner, Caruso observed Demby enter a house before again approaching the vehicle. Once at the vehicle, Demby handed Smith a small rock, off-white in color, later identified as cocaine, for which Demby was paid twenty dollars. Both Smith and Caruso described the seller as a dark-complected black male wearing white shorts with a red bandana on his head. The officers made a second purchase from a different seller approximately four minutes after the Demby transaction.

The trial testimony of the two officers reflected an incomplete recollection of the events that transpired following their receipt of the cocaine from Demby. Smith initially testified that Demby had handed him the cocaine and that he later turned the drugs over to Detective William Kent ("Kent") of the Dover Police Department. On re-direct examination, however, Smith reviewed the video surveillance of the sale and concluded that he had in fact handed the drugs to Caruso. Both Caruso and Smith testified that Caruso had been the one to place the cocaine in a small envelope immediately following the sale and that the envelope was

given to Kent. Neither officer could recall who actually gave the envelope to Kent.

Detective Kent's trial testimony, however, was partially in conflict with the events as recalled by Smith and Caruso. Kent stated that he received the cocaine approximately five or six blocks from where the transaction took place and within five to seven minutes of the purchase from Demby. Specifically, Kent recalled that Smith had handed him a "small amount of crack cocaine" that was "loose in his hand" and "not in any envelope." Kent confirmed that the cocaine received from Smith in the Demby purchase was not commingled with any other cocaine received that evening and that it was placed in an evidence envelope marked "DB–17" (direct buy number 17). That evening Kent deposited the contraband in the Dover Police Department evidence chute, after having first sealed the cocaine in an envelope and placing a red sticker on the back.

Robert Hughes ("Hughes"), an evidence technician for the Dover Police Department, testified concerning the general procedures used to log in evidence envelopes when they are removed from the evidence chute. With respect to the Demby evidence, he testified that because someone had written the direct buy number on the incorrect line of the envelope he used white-out to delete the direct buy number, changing it to another line, and entering the correct complaint number on the correct line. The evidence envelope was then placed in a secured area until five months later when it was taken by a courier, in a locked combination box, to the Medical Examiner's Office for testing. Carolyn Honse, a forensic chemist at the Medical Examiner's Office confirmed that the substance purchased from Demby tested positive as being 0.20 grams of cocaine.

Assisting the undercover drug unit on July 13, 1995, was Officer James E. Hosfelt ("Hosfelt") of the Dover Police Department. On that date, Smith gave Hosfelt a descrip-tion of a person from whom he had purchased cocaine on New Street. The description by Smith was that the seller was a black male, dark complected and wearing white shorts with a red bandana on his head. After receiving this description Hosfelt located an individual in the area around New Street who fit the description and who identified himself as Raymond Demby. That same evening Detectives Smith and Caruso identified Demby from a photograph as the person from whom they purchased the cocaine. At trial, Smith identified Demby as being the cocaine seller while Caruso confirmed her photographic identification of Demby.

At trial, Demby testified that on the night in question, he was dressed in black pants, a purple and yellow T-shirt and a purple scarf. He admitted asking the detectives to throw money out of the car window because he intended to "beat them," or take the money and run. When he realized they would not throw the money out he told them to meet him down the street. At that point, Demby claimed he recognized Caruso as a police officer and, when the detectives turned around, he walked in the opposite direction. Demby denied that he had approached the car and sold the officers cocaine. By its guilty verdict, the jury apparently disbelieved Demby's claim that he was not the individual who delivered the crack cocaine to the undercover officers and rejected his claim that the police mishandled the substance which later tested positive as cocaine.

## II

Demby first challenges his conviction on the ground that the 1994 enactment of 10 *Del.C.* § 4331(1) and (2), Delaware's "chain of custody" statute, is violative of his right to due process because it (i) relieves the State of the responsibility to establish a chain of custody from the time of chemical testing until trial,[1] and (ii) it eliminates from the chain of custody the person who transports

---

1. This argument is distinct from a claim that the defendant's right to a fair trial was prejudiced because of the State's failure to preserve evidence. *Deberry v. State*, Del.Supr., 457 A.2d 744 (1983); *See Government of Virgin Islands v. Testamark*, 3d Cir., 570 F.2d 1162 (1978). Demby concedes that the State did, in fact, preserve the drug evidence and that he had not requested a re-testing of this evidence. We therefore will consider this claim only so far as it pertains to the chain of custody related to the admissibility of the cocaine and laboratory reports at Demby's trial.

or handles the packaged evidence. Demby asserts that the State's obligation to prove every element of the crime beyond a reasonable doubt includes the burden of establishing every step in the chain of custody. By eliminating certain "links," it is argued that § 4331(1) and (2) deprives a defendant of the opportunity to examine the evidence against him—a right guaranteed by the United States Constitution and Delaware Constitution.

The essence of Demby's argument is that § 4331 circumvents or directly repeals rights that a defendant is afforded under Delaware Rules of Evidence 901(a). D.R.E. 901(a), which requires the authentication or identification of evidence as a condition precedent to admissibility, places on the State the burden of establishing the chain of custody of evidence it wishes to offer against criminal defendants at trial.[2] Demby argues that the provisions of 10 *Del.C.* § 4331 that remove certain "links" in the chain of custody have the effect of relieving the State of its duty under D.R.E. 901.

The relevant portions of the "chain of custody" statute as found at 10 *Del.C.* § 4331 provide:

In the context of controlled dangerous substances:

(1) "Chain of Custody" means:
 a. The seizing officer;
 b. The packaging officer, if the packaging officer is not also the seizing officer; and
 c. The forensic toxicologist or forensic chemist or other person who actually touched the substance and not merely the outer sealed package in which the substance was placed by the law enforcement agency before or during the analysis of the substance.

(2) "Chain of Custody" does not include a person who handled the substance in any form after analysis of the substance.

(3)(d) Nothing in this section precludes the right of any party to introduce any evidence supporting or contradicting the evidence contained in or the presumption raised by the statement.

These provisions, as enacted, eliminate the required appearance at trial of those individuals who merely handle contraband evidence in sealed packages during its transportation between a law enforcement agency and the State Medical Examiner's office, as well as those who handle the evidence after it has been tested.

■ In general, Delaware's chain of custody law requires that the State authenticate the evidence proffered and eliminate the possibilities of misidentification and adulteration, not to an absolute certainty, but simply as a matter of reasonable probability. *Tatman v. State,* Del.Supr., 314 A.2d 417, 418 (1973). We have never interpreted this standard as requiring the State to produce evidence as to every link in the chain of custody. Rather, the State must simply demonstrate an orderly process from which the trier of fact can conclude that it is improbable that the original item has been tampered with or exchanged. *Tricoche v. State,* Del.Supr., 525 A.2d 151, 153 (1987). The State argues that § 4331 permits it to satisfy this burden without having to produce at trial all persons who may have played some insignificant role in the chain of custody.

■ A review of the testimony presented at Demby's trial illustrates how the State, absent testimony from a courier, can establish to a reasonable probability that evidence was not adulterated. The record reflects that the substance purchased from Demby was turned over to Kent within five to seven minutes after its receipt. Shortly thereafter, Kent testified that he placed this substance in a sealed envelope and deposited it in the Dover Police Department evidence chute. Evidence technician Hughes testified that once an object is dropped in the evidence chute it enters a secured area to which only he and two other technicians have access. Hughes further testified that his office will only process evidence that is received in

---

**2.** D.R.E. 901(a) states in pertinent part:
 (A) *General Provision:* The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims.

sealed envelopes with no indication of tampering and that, as a matter of policy, the technicians do not open the envelopes. The evidence remains in a secured area until it is transported by a courier in a locked combination box to the Medical Examiner's office for testing.

Mrs. Honse of the Office of the Chief Medical Examiner in Wilmington, testified that her department will not conduct tests on evidence if there is an indication that the envelope has in any way been tampered with or altered. She had personally conducted the chemical testing of the substance contained in the envelope identified as the Demby purchase and recalled that the envelope showed no indication of tampering. Her testing revealed that the substance was in fact 0.20 grams of cocaine. Once the testing was complete, the evidence was returned by a courier in a locked combination box to the police evidence locker and remained there until trial.

██ Demby argues, however, that when drugs are transported by a courier, there exist the potential for confusion between various evidence envelopes. He raises as an example the possibility that an envelope containing heroin from an undercover purchase could be mistaken for an envelope containing cocaine or a counterfeit substance acquired from a second purchase by police. For this reason, Demby argues that the State should be required to produce the couriers at trial so that the defense can question them and explore the issue of mishandling during transportation. We recognize that the possibility of confusion of the evidence during transportation, no matter how remote, does exist. Contrary to Demby's argument, however, § 4331 does not preclude the defense from exploring this issue in an effort to prevent the admission of evidence.

Although § 4331(1) and (2) create a presumption that evidence was not tainted during transportation, § 4331(3) clearly provides that a defendant may introduce evidence that contradicts the presumptions raised by the statutes. Demby, or any other defendant, was able to call witnesses or offer evidence that would have rebutted the presumption contained in § 4331(1) and (2), thus requiring

the State to demonstrate, to a reasonable probability, that the evidence being presented was not tampered with or misidentified. At oral argument, the State conceded that a defendant, seeking to preclude the admission of evidence, may subpoena a person whom the statute has eliminated from the chain of custody to testify either as part of a pretrial suppression hearing or at trial as part of the defense case.

██ We conclude that the presumption created by 10 *Del.C.* § 4331 does not reduce the State's burden under D.R.E. 901 to establish the authentication or identification of evidence as a condition precedent to the admissibility of that evidence. Rather, § 4331 acts only to eliminate the logistical and financial burden that the State would face if it were required to produce at trial every person who handled the evidence, irrespective of how tangential the contact might have been. Since § 4331 does not limit a defendant's right to raise issues concerning possible contamination or limit his right to call witnesses to demonstrate the possibility of tampering during transportation for exclusionary purposes, we find it consistent with the due process guarantees of both the United States Constitution and Delaware Constitution.

### III

██ Apart from his attack on the constitutionality of the chain of custody statute, Demby claims the State failed to eliminate, as a matter of reasonable probability, the risk that the substance delivered to the Medical Examiner's Office for testing was not the same substance which he was alleged to have sold to the police. In support of this claim he points to: (i) inconsistencies in the officers' testimony with respect to their handling of the evidence prior to it being deposited in the evidence locker; and (ii) the fact that the evidence envelope, when retrieved from the evidence locker, had been altered to correct the "direct buy" entry. In our view, however, these factual discrepancies, and the inferences to be drawn from them, go to the weight to be accorded the evidence rather than to its admissibility.

In general, the decision whether evidence has been sufficiently authenticated in accordance with D.R.E. 901(a) is a matter relegated to the sound discretion of the trial judge. *Ciccaglione v. State,* Del.Supr., 474 A.2d 126, 130 (1984); *Thompson v. State,* Del.Supr., 399 A.2d 194, 198–99 (1979). Under D.R.E. 901(a) the party offering an item for evidence bears the burden of presenting other "evidence sufficient to support a finding that the matter in question is what its proponent claims." In satisfying its burden, the State may authenticate an item either by having a witness visually identify the item as the one that was involved in the crime, or it may establish a chain of custody, "'which indirectly establishes the identity and integrity of the evidence by tracing its continuous whereabouts.'" *Whitfield v. State,* Del. Supr., 524 A.2d 13, 16 (1987) (quoting *United States v. Zink,* 10th Cir., 612 F.2d 511, 514 (1980)).

In the present case, as with many criminal prosecutions where drugs are sold in their natural state and thereafter stored in commonplace containers, no witness could positively identify the bag of cocaine presented at trial as the actual drugs that Demby sold to police. *See, Whitfield,* 524 A.2d at 17 (the weapon did not contain any unique or identifying markings). Absent this identification, the State is required to sufficiently trace the continuous "whereabouts of the drugs, *i.e.,* the physical location from the time of seizure at the crime scene until the time of trial." *Tricoche,* 525 A.2d at 153. This is a lenient burden that requires only that the State eliminate the possibilities of misidentification and adulteration, "not absolutely, but as a matter of reasonable probability." *Tatman,* 314 A.2d at 418.

In arguing the State failed to satisfy its burden, Demby points to the conflicting testimony of Officers Smith and Caruso as well as the testimony of Detective Kent. Smith initially testified that he was the passenger in the undercover vehicle and that following the purchase from Demby, he had turned the drugs over to Kent. The following day however, after reviewing the videotape of the transaction, Smith testified that he had been the driver of the vehicle when the purchase was made and that he immediately handed the drugs to Caruso, who, in turn, placed them into a small envelope. Caruso testified, supporting Smith's revised statement, that Smith handed her the cocaine upon its receipt and that she had in fact placed the drugs in a small envelope. Neither officer could recall who released the cocaine to Kent. In apparent conflict with the testimony of Smith and Caruso, Kent testified that Smith handed him a small amount of crack cocaine that was loose in hand and not in any envelope.

In addition to his claims concerning inconsistent testimony, Demby challenges the admission of the evidence based on the alleged mishandling of the drugs by evidence technicians at the Dover Police Department. As previously noted, five months after the initial seizure and just prior to sending the drugs to the Medical Examiner, an evidence technician used white-out to delete the direct buy number, change it to another line, and then entered the CR number on the correct line. Demby alleges that the use of white-out resulted in a defect in the chain of custody because the State could no longer identify the number that had originally been written on that line and thus could not rule out the possibility of misidentification.

When determining the sufficiency of the chain of custody, the trial judge should admit tangible objects such as narcotics "when proof of their original acquisition and subsequent custody forges their connection with the accused and the criminal offense." *Gass v. United States,* D.C.App., 416 F.2d 767, 770 n. 8 (1969). Relevant factors in the chain of custody analysis include the circumstances surrounding the purchase of the drugs and their preservation while in custody. *See, Clough v. State,* Del.Supr., 295 A.2d 729 (1972). In essence, the State in this case was required to provide a rational basis from which the trial judge could conclude that it was improbable that the original item had been confused with similar evidence and that the evidence had not been the subject of tampering. *Tricoche,* 525 A.2d at 153.

With respect to the acquisition of the drugs from Demby and their subsequent release to Detective Kent, the State estab-

lished to the satisfaction of the trial judge that the evidence had not been adulterated. The uncontradicted testimony of the three law enforcement officers established that: (i) a substance was purchased from Demby in exchange for $20; (ii) within five to seven minutes of the purchase the object was delivered to Kent; (iii) Kent then placed the object in a sealed envelope on which he placed Demby's name, the complaint number, Kent's name, and the date and time of purchase; (iv) latter that evening, on July 13, 1995, Kent deposited the envelope into a secured evidence chute that was accessible only to three Dover police technicians; and (v) at trial, Kent confirmed the evidence envelope used for the Demby purchase was in the same condition as it was on July 13, except for the evidence technician and medical examiner's tags.

The trial judge also found that the chain of custody was not broken when the drugs were in the possession of the police technicians. Technician Mahaffey testified that, following its deposit, she removed the envelope from the evidence chute on the first work day following its deposit, stamped and initialed the envelope, then promptly secured it in an evidence locker. She further testified that the evidence tag on the envelope indicated that Kent had deposited the evidence into the evidence chute and that, following her initial contact, the envelope was next handled by Hughes on January 6, 1996. Hughes in turn testified that he removed the envelope from the locker in order to place the CR number on the evidence tag and to prepare the envelope for transport to the medical examiner's office. When using the white-out to change the location of the direct buy number, Hughes stated that he could not have confused the envelope with another because he works on only one item at a time.

While Demby is correct that the officers' testimony, with respect to the handling of the drugs, was not in total harmony, there was sufficient consistency to permit the trial judge, in his discretion, to conclude that the evidence was not tampered with or confused with other drugs prior to its being deposited in the evidence chute. Similarly, the record supports the trial court's conclusion that the evidence was either in the custody of the Medical Examiner or in a secured evidence locker from the time of its seizure until Demby's trial. In sum, the State established the identity and integrity of the evidence by tracing its continuous whereabouts, thereby establishing a chain of custody. Based on the record before us, we find the Superior Court's ruling, that the State satisfied its burden of eliminating to a reasonable probability the possibility of adulteration or misidentification of the evidence, to be supported by the record and a proper exercise of discretion.

 Despite Demby's failure to preclude the admission of the drugs into evidence based on possible deficiencies in the chain of custody, he remained free to reassert the identical arguments during his trial in an effort to persuade the jury to accord little weight to the drug evidence. The trial judge's threshold determination of admissibility is directed to the application of a legal standard to the facts presented. *Whitfield,* 524 A.2d at 16. Although the trial judge's ruling may require the determination of facts where the evidence is in conflict, a defendant remains free to argue to the jury that discrepancies existed in the handling of the evidence. The jury, as the ultimate finders of fact, may consider whether there are significant breaks in the chain of custody or tampering, when determining what weight the evidence should be accorded. *Polite v. State,* Del.Supr., 687 A.2d 196, 1996 WL 415905 (1996). In Demby's case, the jury was satisfied that the drugs presented at trial were the same drugs that Demby had sold to police. Based on the record presented, this Court will not disturb the jury's findings. *See, Chao v. State,* Del.Supr., 604 A.2d 1351, 1363 (1992).

The judgment of the Superior Court is AFFIRMED.