# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| STATE OF DELAWARE | ) | |
| | ) | |
| v. | ) | I.D. No. 2403005415 |
| | ) | |
| CHRISTIAN CHURCH | ) | |
| | ) | |
| Defendant. | ) | |

Submitted: February 18, 2025
Decided: May 15, 2025

## <u>MEMORANDUM OPINION AND ORDER</u>

*Upon Defendant's Motion For Judgment Of Acquittal*

**DENIED IN PART and GRANTED IN PART**

*Upon Defendant's Motion For New Trial*

**DENIED**

Angelica S. Endres, Deputy Attorney General, Department of Justice, Dover, Delaware, *Attorney for the State*.

Alicia A. Porter, Esq., Benton & Shockley Law, P.A., Dover, Delaware, *Attorney for the Defendant*.

**Primos, J.**

**INTRODUCTION**

After Christian Church ("Defendant") was indicted for (1) assault in the first degree of one victim, and (2) assault in the second degree of another victim, the charges were tried before a Superior Court jury. At the close of the State's case-in-chief, Defendant moved for judgment of acquittal. The Court denied that motion. In a renewed motion for judgment of acquittal, Church contends that the Court erred in holding that the State presented legally sufficient evidence of intent to support count one of the indictment, and legally sufficient evidence of causation and serious physical injury to support count two. The Court today reaffirms its holding as to count one. However, the Court also holds that the jury heard insufficient evidence that Church in fact caused serious physical injury to victim Amarion Nutter, as required to convict him on count two. Accordingly, Church's motion for judgment of acquittal is **DENIED IN PART and GRANTED IN PART.** Church also urges the Court to grant him a new trial on the ground that a video depicting him beating Nutter was improperly admitted at trial, citing the purportedly insufficient authentication of that evidence. The Court concludes that the video was properly authenticated, and that Church fails to raise a genuine question of its authenticity. Thus, Church's motion for a new trial is **DENIED.**

I.    **BACKGROUND**[1]

   **A. Procedural History**

On May 6, 2024, a grand jury returned an indictment charging Defendant with the assault in the second degree of Kaden Handte ("Handte").[2] On August 5, 2024, Defendant was reindicted for assault in the first degree of Handte and assault in the second degree of Amarion Nutter ("Nutter").[3] As to the first count, the indictment

---

[1] Citations in the form of "D.I. ___" refer to docket items.
[2] D.I. 5.
[3] D.I. 12. On January 21, 2025, the State entered a *nolle prosequi* on the May 6, 2024, indictment for assault in the second degree. D.I. 24.

read as follows:

> ASSAULT FIRST DEGREE, a felony, in violation of Title 11, Section 613(a)(2) of the Delaware Code of 1974, as amended.

> CHRISTIAN R. CHURCH, on or about the 9th day of March, 2024, in the County of Kent, State of Delaware, did intentionally disfigure-seriously-and-permanently or destroy or amputate or disable-permanently Kaden Handte.[4]

As to the second count, the indictment read as follows:

> ASSAULT SECOND DEGREE, a felony, in violation of Title 11, Section 612(a)(1) of the Delaware Code of 1974, as amended.

> CHRISTIAN R. CHURCH, on or about the 9th day of March, 2024, in the County of Kent, State of Delaware, did intentionally or recklessly cause serious physical injury to Amarion J. Nutter.[5]

The Court held a six-day jury trial. At the close of the State's case-in-chief, Defendant moved for a judgment of acquittal, contending that there was insufficient evidence of Defendant's intent to support a conviction on count one of the indictment, and insufficient evidence of causation and serious physical injury to support a conviction on count two. The Court denied that motion. At the prayer conference following the close of the evidence, the Court granted[6] the State's request to instruct the jury on the lesser-included offenses of assault in the second degree as to Handte[7] and assault in the third degree and offensive touching as to both Handte and Nutter. On January 29, 2025, the jury returned a verdict of guilty on the lesser

---

[4] D.I. 12.

[5] *Id.*

[6] "[T]he trial judge must give a lesser-included offense instruction at the request of either the defendant or the prosecution—even over the objection of the other party—if the evidence presented is such that a jury could rationally find the defendant guilty of the lesser-included offense and acquit the defendant of the greater offense." *State v. Cox*, 851 A.2d 1269, 1275 (Del. 2003).

[7] The Court's jury instruction for assault in the second degree as to Handte read, in relevant part: "In order to find Defendant guilty of Assault in the Second Degree, as an included offense to Count 1 of the indictment, you must find the state has proved the following two (2) elements beyond a reasonable doubt: (1) Defendant caused serious physical injury to Kaden Handte; and (2) Defendant acted intentionally or recklessly." Jury Instr. 9 (D.I. 30).

included offense of assault in the second degree of Handte (the "Handte Conviction") and the charged offense of assault in the second degree of Nutter (the "Nutter Conviction"). Defendant timely filed a renewed motion for judgment of acquittal—re-raising the arguments presented at the close of the State's evidence—and a motion for a new trial.

### B. Factual Background

The following relevant facts were adduced at trial. Given the procedural posture, the evidence is viewed in the light most favorable to the State, drawing all reasonable inferences in its favor.[8]

On the evening of March 8, 2024, Handte, Nutter, and two friends drove to a bonfire party at a rural property in Sandtown, Kent County, Delaware. Upon arriving, Handte entered a camping trailer and introduced himself to Defendant before returning to his friends. Approximately half an hour after the group arrived, Defendant, Cole Moffett ("Moffett"), and several others approached them. Moffett, through a megaphone, called Nutter, who is of mixed race and has a dark complexion, "the N-Word"[9] and told him he was not welcome at the party. Moffett is white.

Handte, who is also white, objected to Moffett's use of the racial slur, and an argument ensued. Shortly after the argument ended,[10] Defendant, consistently described by witnesses as a large, bearded white man in a camouflage shirt, approached Handte from behind and punched him forcefully in the jaw.[11] Handte

---

[8] *McGuiness v. State*, 312 A.3d 1156, 1187 (Del. 2024) (quoting *Hopkins v. State*, 293 A.3d 145, 150 (Del. 2023)).

[9] This Court follows the Supreme Court's lead in declining to reproduce the slur, even in redacted form. *See Jewell v. State*, 2025 WL 957377, at *1 (Del. Mar. 31, 2025) (en banc) (citation omitted).

[10] Handte estimated that fewer than fifteen or twenty minutes elapsed.

[11] One of the victims' friends, Elijah Smith, testified that he saw Defendant approach someone wearing a dark sweatshirt with a raised hood from behind, punch him, and then continue beating him. Both Handte and Nutter were wearing dark hooded sweatshirts, and Handte testified that he had his hood up at the time he was attacked. Smith was some distance away, and therefore may

did not see the person who struck him, but Nutter, standing just a few feet away, recognized Defendant as the assailant.[12]  After Defendant struck Handte, Nutter either shoved or struck Defendant, and the two ended up in a brawl on the ground. Defendant, who is of much greater size and weight than Nutter, quickly placed himself on top of the smaller man.[13]  From this superior position, Defendant repeatedly punched Nutter in the head.  After the brawl, Nutter was "woozy" and "confused."  He stepped away from the group to vomit.  Meanwhile, Handte got to his feet and escaped to the opposite side of the bonfire.

After Nutter vomited, he searched for Handte to check that his friend was uninjured, but was waylaid and pushed into a crowd of thirty or forty people.  Nutter then became involved in a fistfight with Moffett.  After taking more blows to the head, Nutter somehow extricated himself from the crowd.  The four friends regrouped and, upon seeing Handte's condition—bleeding, slurring, and

---

have been confused between the object of the initial attack (Handte) and of the subsequent beating (Nutter).

[12] After the events, Handte contacted Defendant through the Facebook Messenger platform.  In full context, Defendant's responses could reasonably be interpreted as inculpatory.  The exchange read as follows:  Handte: "Hey man you feel good about what you did?  You got a hell of a punch dude wish I coulda [sic] seen it coming[.]  I'll be eating though [sic] a straw for a while[.]  But I guess that's not too bad, get that Facebook time in now son[.]  Can't wait to see that a[**] in court[.]"  Church: "Hey man listen im [sic] sorry for all of this none of that should have happened."  Handte: "You're right[.]  I coulda [sic] swore [sic] I came up introduced myself to you respectfully earlier that night?  Maybe I'm tripping though[.]  I was surprised when I found out it was you[.]"  Church: "I really have never met you[.]"  Handte: "You weren't sitting in the trailer that night?  You definitely were[.]  Maybe ya [sic] had too much to drink[.]  All good man just had to say my peace [sic] [.]"  Church: "Well my peace [sic] is i [sic] dont [sic] want to argue i [sic] dont [sic] want to fight i [sic] didnt [sic] ask for any of this trouble or for someone to be really hurt[.]"  State's Ex. 13.  Defendant's mother testified that Defendant admitted to fighting with Nutter, but that he denied striking Handte, whereas Moffett confessed to attacking Handte.  The jury was not required to find the exculpatory portion of her testimony credible, and evidently did not credit it. *See State v. Owens*, 2010 WL 2892701 (Del. Super. July 16, 2010) ("The jury has 'the discretion to accept one portion of a witness' testimony and reject another part.'" (quoting *Pryor v. State*, 453 A.2d 98, 100 (Del. 1982))).

[13] Defendant is, per driver's license records, six feet and one inch tall and three hundred pounds. Nutter is seven inches shorter than Defendant and of relatively slender build.

incoherent—left for the nearest hospital.

Handte was clearly in worse condition than Nutter at the end of the night. His jaw was broken on both the left and right side and required surgery, including the installation of permanent hardware.[14] This hardware later became infected, and Handte has needed additional surgery and follow-up visits with medical providers.[15] Handte lost between twenty and twenty-five pounds of weight because he was unable to eat regularly for months.[16] Handte continues to experience the effects of the assault. Handte has a likely-permanent divot in his face from the injury and subsequent surgeries. If he does not regularly stretch his jaw throughout the day, he will awaken the next morning with his mouth "locked up." Handte, a recently-graduated high school athlete, struggles to perform physical activities, such as lifting heavy weights or playing sports, because it triggers jaw pain. Handte's doctors have told him that his jaw will never heal to the point that it is "how it was," and that he will "have to take it easy going forward." The State introduced Handte's medical records into evidence.

Nutter suffered a black eye, and his "thumb was a little messed up." Nutter testified that, after he returned home from the incident, he vomited again, "but it wasn't too bad." He felt confused and struggled to remember some details of the incident. His head felt "inflated," and he went to the doctor four days later because he was lightheaded, experiencing persistent headaches, and not himself. His memory of March 8, 2024, remains somewhat "foggy." No party admitted Nutter's medical records.

Shortly after the events of March 8, 2024, Handte's father became aware of at

---

[14] Surgeons inserted an "Erich arch bar" and four screws. State's Ex. 11 at 1.

[15] Postoperative complications required partial removal of the arch bar and complete removal of one of Handte's wisdom teeth. *Id.* at 16–18.

[16] At the time of trial, Handte stated that he had been able to eat regularly for approximately five months but was still approximately ten pounds under his prior weight.

least three social media videos depicting those events. He forwarded those videos to law enforcement investigators. The State introduced each of those videos into evidence.

In the first video, introduced as State's Exhibit 4 (hereinafter "Exhibit 4"), Defendant, wearing a long-sleeved brown camouflage shirt, is depicted straddling Nutter, who is prostrate in a black and yellow hooded sweatshirt. Blaring music has been edited over the video, and there is a "TRILLER" logo in the lower-left corner of the image. As Defendant sits astride Nutter, he repeatedly brings his right fist down on Nutter's head, which Nutter is attempting to cover with his arm. In the brief eleven-second clip, a large fire is visible in the background, and a thick throng of people, Moffett among them, surround the two men. It appears that some in the crowd, including Moffett, may have been kicking Nutter in the ribs and stomach,[17] but it is difficult to tell whether this is the case, or if they are merely shoving against one another in an attempt to get close to (or break up) the fight. Neither the beginning nor the end of the incident is depicted in the video clip.

In the second video, introduced as State's Exhibit 5, Nutter and Moffet are encircled by a large crowd and are engaged in a wild fistfight. As the two whirl around the clearing, Moffet repeatedly strikes Nutter in the face before pulling him into a headlock. Defendant then separates the two as a third young white man repeatedly strikes Nutter in the back and head with two-handed blows. Defendant intervenes, and the third man desists.

In the third video, introduced as State's Exhibit 6, Nutter is not immediately visible through the thick crowd, but Moffett is depicted punching and possibly kicking someone on the ground before being restrained by bystanders. Someone in the crowd then lifts a visibly dazed Nutter from the ground.

---

[17] Handte testified that, when he recovered from his own assault, he witnessed Moffett, three to five feet away, either punching or stomping on Nutter.

7

At trial, defense counsel objected to the admission of Exhibit 4 through Nutter's testimony, arguing that he was unable to properly authenticate it under Delaware Rule of Evidence 901. During *voir dire*, Nutter testified that he recognized himself, Defendant, and Moffett in the video. He stated that he recognized the sweatshirt he was wearing that night and his distinctive long hair, and that he remembered being hit in the head while on the ground, although he could not recall many details. The Court overruled Defendant's objection, and Exhibit 4 was thus admitted through Nutter after the jury returned.

At trial, Defendant called private investigator Robert Workman, evidently for the purpose of casting doubt on Exhibit 4. Workman testified that the "TRILLER" watermark was an apparent reference to a smartphone application. Workman stated that the application allows users to add music to videos and that it has artificial intelligence features that can autonomously edit or "shuffle" videos. Stating the obvious, Workman told the jury that edited videos do not include content that has been cut out of them, such as prior and subsequent footage. Workman ultimately opined, without objection, that "most" of the videos shown in the trial were "out of sequence," in that certain events might have been edited to appear in a different order than they occurred.

## II. ANALYSIS

### A. Defendant's Motion For Judgment Of Acquittal Must Be Denied As To The Handte Conviction And Granted As To The Nutter Conviction Given The Evidence Relevant To Each Charge.

#### 1. Standard of Review

Defendant's motion for judgment of acquittal is governed by Superior Court Criminal Rule 29.[18] Under that rule, "[t]he Court will grant a defendant's motion

---

[18] *State v. Ford*, 293 A.3d 372, 377 (Del. Super. Apr. 19, 2023), *aff'd*, 2025 WL 1257476 (Del. May 1, 2025).

8

'*only* when the state presented insufficient evidence to sustain a verdict of guilt.'"[19] As the Court must be careful not to supplant the jury's role as factfinder,[20] the question on a motion for judgment of acquittal is "whether any rational trier of fact, viewing the evidence and all the reasonable inferences to be drawn therefrom in the light most favorable to the State, could find the defendant guilty beyond a reasonable doubt of all the elements of the crime."[21]

### 2. The State Produced Sufficient Evidence Of Intent To Support The Handte Conviction

The Court did not err in denying Defendant's motion for judgment of acquittal on count one at the close of the state's evidence. A rational juror could have found, based on the evidence presented, that Defendant possessed the necessary *mens rea* for assault in the first degree of Handte, the then-pending charge. Pursuant to that charge, the jury would have been required to find that Defendant "intentionally disfigure[d] another person seriously and permanently, or intentionally destroy[ed], amputate[d] or disable[d] permanently a member or organ of another person's body."[22] Defendant contends that "[t]he State failed to provide any evidence as to Count 1 regarding Defendant's intention to disfigure seriously and permanently or to disable [Handte] permanently."[23] To the contrary, the State presented sufficient evidence for the jury to infer that this was Defendant's intent.

---

[19] *Id.* (quoting *Vouras v. State*, 452 A.2d 1165, 1169 (Del. 1982)) (emphasis in original).

[20] *State v. Thomas*, 2019 WL 669934, at *3 (Del. Super. Feb. 8, 2019) (quoting *Washington v. State*, 4 A.3d 375, 378 (Del. 2010)).

[21] *McGuiness*, 312 A.3d at 1187 (quoting *Hopkins*, 293 A.3d at 150).

[22] 11 *Del. C.* § 613(a)(2). The charge of which the jury ultimately convicted Defendant, the lesser-included offense of assault in the second degree, permitted a guilty finding if Defendant acted either intentionally *or recklessly* and caused Handte serious physical injury. However, as Defendant moved for a judgment of acquittal at the close of the State's case, before any request for a lesser-included instruction was made, the question before the Court at that time was whether there was sufficient evidence to convict Defendant as charged in the indictment. The indictment charged Defendant with acting intentionally.

[23] Defendant's Motion ¶ 2.a. Defendant's motion used the phrasing "to disable Defendant permanently." The Court has corrected this obvious typographical error for clarity.

11 *Del. C.* § 306(c)(1) permits the jury to draw an inference[24] that "a person . . . intend[s] the natural and probable consequences of the person's act." The Delaware Supreme Court "has repeatedly upheld the application of § 306(c)(1) in the context of intentional assaults."[25] Thus, if any reasonable juror could have found that serious and permanent disfigurement or the permanent disability of Handte's jaw was the natural and probable consequence of striking Handte as Defendant did, his motion must fail.

A reasonable juror could conclude that permanent disfigurement or disability was the natural and probable consequence of striking Handte in the manner and with the force that Defendant did. As this Court has observed, "[n]o doubt, 'serious physical injury' has been the resultant harm from 'fights,' 'altercations,' and bodily assaults with or without weapons."[26] Here, of course, serious physical injury was not enough. Such injury gives rise to liability for assault in the *second* degree, the lesser included offense of which Defendant was actually convicted. This distinction is, however, somewhat deceptive, because "serious physical injury" includes "physical injury which creates a substantial risk of death, or which causes *serious and prolonged disfigurement, prolonged impairment of health or prolonged loss of the function of any bodily organ.*"[27] As charged in this case, therefore, a principal distinction between the requisite injuries for assault in the first degree and assault in the second degree is the duration of the injuries.

---

[24] Although the statute uses the phrase "rebuttable presumption," the Delaware Supreme Court has recognized that "[t]he federal Constitution . . . would prohibit a statute which . . . shifts the burden of persuasion to the defendant" and has interpreted the statute to avoid such a violation. *Plass v. State*, 457 A.2d 362, 366 (Del. 1983).

[25] *Carlo v. State*, 152 A.3d 123, 2016 WL 7011354 (Del. Nov. 30, 2016) (ORDER) (citing *Harris v. State*, 965 A.2d 691, 693 (Del. 2009); *Guinn v. State*, 894 A.2d 406, 2006 WL 506433, at *2 (Del. Feb. 28, 2006) (ORDER)).

[26] *State v. Clark*, 2018 WL 7197607, at *5 (Del. Super. Oct. 1, 2018) (collecting cases), *aff'd on other grounds*, 224 A.3d 997 (Del. 2020).

[27] 11 *Del. C.* § 222(32) (emphasis supplied).

Here, a jury could conclude that Defendant intended to seriously and permanently disfigure Handte or disable his jaw, rather than merely impair it for a "prolonged" period of time. Defendant is over six feet tall and of heavy build. Witnesses and Defendant's driver's license both put his weight at 300 pounds. It is obvious from the serious physical injuries Handte suffered[28] that Defendant was capable of striking with great force, and that he in fact did so. If the jury reasonably concluded that Handte's disfigurement and/or disability from his injuries was permanent, rather than merely prolonged, it could infer that Defendant intended to inflict such injuries.[29] Even if Defendant merely intended to inflict *some* injury, but

---

[28] Defendant does not now contend that the jury lacked an evidentiary basis to find that Handte suffered serious physical injuries, and such argument would be frivolous given the evidence. *See Snow v. State*, 542 A.2d 1215, 1988 WL 61577, at *1 (Del. June 2, 1988) (ORDER) (victim suffered serious physical injury when he suffered a broken jaw, his jaw was wired shut for five weeks as a result, and he had a "permanent and visible indention under his left eye"); *Cronin v. State*, 454 A.2d 735, 736–37 (Del. 1982) (victim who was "unable to chew certain foods" for four months due to tooth damage suffered serious physical injury). Indeed, defense counsel conceded in her closing argument that Handte's injuries met the statutory requirements for serious physical injury.

[29] The jury could have reasonably found that Handte suffered permanent serious disfigurement or disability. The State presented evidence that Handte has a likely-permanent divot on his face, which the jury could reasonably have concluded rose to the level of a serious permanent disfigurement. The Supreme Court has held that a bite scar on an officer's arm could reasonably be interpreted as a "serious . . . disfigurement." *Bradley v. State*, 193 A.3d 734, 739 (Del. 2018). The divot in Handte's face is smaller than the marks left by a bite. However, in the analogous context of workers' compensation claims for serious and permanent disfigurements, Delaware courts recognize that scarring to the face is more serious than similarly-sized scars to other parts of the body. *Hodgson v. Chrysler Grp., LLC*, 2012 WL 1435006, at *2 (Del. Super. Apr. 25, 2012) (citing *Martinez v. Gen. Metalcraft, Inc.*, 919 A.2d 561, 2007 WL 521906, at *3 (Del. Feb. 21, 2007) (ORDER)). While Defendant's permanent injury is not a scar, it is, like a scar, a "disfigurement," and the principles just cited are therefore applicable. Far more significant to this case, however, is the evidence of permanent disability. As noted *supra*, Handte has metal hardware permanently installed in his body and can no longer engage in his customary level of physical activity because it causes him pain. Handte's jaw has a tendency to "lock up" in the mornings if not regularly stretched. His doctors tell him that his jaw will never return to normal. As the Court noted in its bench ruling on Defendant's motion for judgment of acquittal, although these issues do not amount to a *total* disability of Handte's jaw, total disability is not a requirement of the statute, and the jury was entitled to find that they collectively rose to the level of permanent disability.

11

Handte in fact was permanently disfigured or disabled, such injuries could hardly be considered so remote or accidental that Defendant should be absolved of responsibility for them.[30]

The Supreme Court has sustained findings of intentionality inferred from far less direct harm than Handte suffered. In *Bradley v. State*, for example, the Court held that a jury could infer that the natural and probable consequences of a defendant's biting of a law enforcement officer included the travails of prophylactic HIV treatment, which "caused painful, physically debilitating side effects such as nausea and diarrhea[.]"[31] Such side effects were, of course, several steps removed from the assault itself. In this case, the relationship between cause and effect is scarcely so attenuated. In light of *Bradley*, a jury could reasonably conclude that the natural and probable consequence of striking Handte in the jaw with great force was that his jaw would be broken, causing permanent serious disfigurement and disability, and that Defendant therefore intended that consequence.[32]

The circumstances surrounding the crime also supported a finding that Defendant intended to permanently disable and/or seriously disfigure Handte.

---

[30] *See* 11 *Del. C.* § 262 ("The element of intentional or knowing causation is not established if the actual result is outside the intention or the contemplation of the defendant unless: . . . the actual result involves the same kind of injury or harm as the probable result and is not too remote or accidental in its occurrence to have a bearing on the actor's liability or on the gravity of the offense.").

[31] 193 A.3d at 739–40 & n.27. The Court has also sustained such findings where the harm resulted from the predictable reaction of third parties. *See, e.g., Harris*, 965 A.2d at 693 ("When Harris ran out of the courthouse, the natural and probable consequence of his conduct was that law-enforcement officers would chase him in an effort to return him to custody. But for Harris's conduct, Wheeler would not have chased after him, or broken his leg. Thus, Harris is criminally responsible for causing that injury." (citation omitted)).

[32] The jury could also reasonably infer that Defendant, by striking at Handte's head, sought to maximize the damage he would inflict. *Cf. Carter v. State*, 933 A.2d 774, 779 (Del. 2007) (plastic lacrosse stick, under the circumstances it was used, was not readily capable of causing death or serious physical injury, because defendant "acted *intentionally*, but his intent was to strike [victim] on the hand, not on the head or some other more vulnerable part of his body[.]" (emphasis in original)).

"Delaware . . . allows a jury to infer intent to commit a crime from the surrounding circumstances."[33] Indeed, Delaware courts draw no distinction between direct and circumstantial evidence.[34] Shortly before he was struck by Defendant, Handte was embroiled in an argument with a group of men with whom Defendant associated, and with whom he was apparently friends.[35] The catalyst for this argument was a racial slur Moffett directed at Handte's friend, Nutter. Defendant was later filmed viciously beating Nutter. A juror could reasonably conclude that Defendant held animus toward Handte and that he intended to inflict extreme physical punishment on him for that reason.

As a subsidiary point, Defendant further objects to this Court's bench decision, in which it was observed that Handte's assailant "would have had to use such force that . . . they should have known that the natural consequences—or could have known, and the jury could conclude . . . that they would have known that using that force could disable permanently a member of that individual's body[.]" Defendant contends that the Court erred in conflating a "knowingly" *mens rea* with "intentionally."[36] Undoubtedly, the latter is a higher state of mind than the former.[37] Even if the Court erred in its bench decision rationale, however, it was harmless error because, for the reasons stated previously, the jury had sufficient grounds to infer Defendant's intent.

---

[33] *Guinn*, 2006 WL 506433, at *2 n.4.

[34] *Ford*, 293 A.3d at 377 n.9 (citing *Poon v. State*, 880 A.2d 236, 238 (Del. 2005)).

[35] In addition to being present for the argument, Defendant was located in the camping trailer when Handte entered it. The property on which the bonfire was constructed, and the trailer located, was owned by Moffett's parents. Moffett's mother testified that Defendant had known her son since childhood. Further, Defendant was pictured at a prior party (presumably also on the Moffetts' land) in a social media post advertising the March 8, 2024, bonfire. State's Ex. 1.

[36] Defendant's Motion ¶¶ 5–7.

[37] *Phillips v. State*, 154 A.3d 1146, 1160–61 (Del. 2017); *Jewell*, 2025 WL 957377, at *19 n.137 ("Proving that a defendant acted intentionally, of course, will also support a conviction for a crime under which the required mental state is 'knowingly.'" (citing 11 *Del. C.* § 253)).

13

Taken together, the jury had ample evidence from which it could conclude, beyond a reasonable doubt, that Defendant intended to permanently disable Handte's jaw and/or seriously disfigure him. Accordingly, Defendant's motion for judgment of acquittal was properly denied as to count one of the indictment.

### 3. The State Provided Insufficient Evidence Of Causation To Support The Nutter Conviction

In order to return the Nutter Conviction, the jury was required to find that Defendant caused serious physical injury to Nutter.[38] Under the Delaware Criminal Code, the State must show "a 'but-for' relationship between an action and a result to establish causation."[39] In the Code's formal language, "[c]onduct is the cause of a result when it is an antecedent but for which the result in question would not have occurred."[40]

Assuming that the physical injuries Nutter suffered on March 8, 2024, were "serious," the jury could not reasonably conclude that Defendant's actions were the "but-for" cause of those injuries. The difficulty in assigning causation arises from the fact that Nutter was attacked multiple times on the night in question, by multiple assailants—Defendant, Moffett, and an unidentified third man. The State has never contended that Defendant is criminally liable (e.g., as an accomplice) for the acts of either of the other two assailants, and the only signs of injury Nutter identified as occurring prior to the other assaults—disorientation and vomiting—were not independently serious enough to support the conviction.[41]

---

[38] 11 *Del. C.* § 612(a)(1).

[39] *Bullock v. State*, 775 A.2d 1043, 1049 (Del. 2001).

[40] 11 *Del. C.* § 261.

[41] Delaware courts have recognized that certain *de minimus* injuries do not rise to the level of "physical injury," much less "serious physical injury." *Compare Harris*, 965 A.2d at 694 (elbow to head, leaving red mark but not causing pain, was not physical injury), *with Mummitt v. State*, 981 A.2d 1173, 2009 WL 3191709, at *3 (Del. Oct. 6, 2009) (ORDER) (beating with belt, causing soreness, allowed jury to conclude victim suffered physical injury), *and Div. of Fam. Servs. v. J.C.*, 2012 WL 4861601, at *4–5 (Del. Fam. May 23, 2021) (bump on child's head, which hurt "a little

Although a victim's testimony is, standing alone, sufficient evidence of his injuries to support a jury verdict,[42] no evidence was presented from which the jury could find that Nutter's ultimate injuries were caused by Defendant's actions as opposed to those of the other assailants. Nutter testified that he suffered headaches for the four days following the night in question, memory loss about the events, and vomiting. Defendant repeatedly punched Nutter in the head; Moffett repeatedly struck Nutter in the face, placed him into a headlock, and likely kicked him in the torso; and a third man also repeatedly struck Nutter in the head. The State presented no evidence that would have helped the jury disaggregate the effects of the various assaults. Given the complexities of the human body (particularly the brain), the jury could not draw a causal link between the blows struck by Nutter's various assailants and his physical symptoms without making an impermissible speculative leap.[43] On a Rule 29 motion, the Court is "not free to substitute [its] own judgment for the jury's assessment[]" of the weight of the evidence,[44] but it must nonetheless grant acquittal if the evidence is insufficient in light of the State's burden to prove guilt beyond a

---

bit" and may have prompted headache was not physical injury, even if causation were established). Even if the jury could infer that Nutter's vomiting and wooziness were prompted by a physical injury Defendant caused, there was no evidence from which the jury could conclude that the injury was sufficiently serious to support an assault second conviction. *See, e.g.*, *Carter*, 933 A.2d at 778 (hand that remained swollen for one month after attack was not serious physical injury). As noted *supra*, under the indictment, such injury would need to "create[] a substantial risk of death, or . . . cause[] serious and prolonged disfigurement, prolonged impairment of health or prolonged loss of the function of any bodily organ[.]" 11 *Del. C.* § 222(32).

[42] *Williamson v. State*, 113 A.3d 155, 159 (Del. 2015) (quoting *McKnight v. State*, 753 A.2d 436, 438 (Del. 2000)).

[43] *Cf. Manerchia v. Kirkwood Fitness and Racquetball Clubs, Inc.*, 992 A.2d 1237, 2010 WL 1114927, at *3 (Del. Mar. 25, 2010) (holding that, because proof of causation "require[d] an understanding and analysis of issues beyond the ken of the typical jury, [plaintiff] had to present expert testimony to establish" it.) (citations omitted); *Mazda Motor Corp. v. Lindahl*, 706 A.2d 526, 533 & n.30 (Del. 1998) (granting directed verdict in products liability case because plaintiff produced no expert testimony on which of decedent's injuries would have been avoided had the product not been defective, which left the jury to speculate).

[44] *Thomas*, 2019 WL 669934, at *5 (citing *Poon*, 880 A.2d at 238; *State v. Biter*, 119 A.2d 894, 898 (Del. Super. 1955)).

15

reasonable doubt. A conviction founded on speculation cannot stand.

The Supreme Court's 1987 decision in *Oxendine v. State* is instructive.[45] In *Oxendine*, the defendant was convicted of the manslaughter of his six-year-old child but was acquitted on appeal because the evidence of causation was insufficient.[46] Key to the Supreme Court's holding was the lack of definitive medical expert testimony.

Although the facts of *Oxendine* do not completely mirror those of this case, there are significant parallels: on one morning, the defendant's girlfriend pushed the child into a bathtub, "causing microscopic tears in his intestines that led to peritonitis."[47] The following morning, the defendant, by his own admission, beat the child.[48] The child's abdomen swelled, and he died in the hospital that afternoon.[49] At trial, the State called two medical examiners, who both testified that the child's death was "caused by intra-abdominal hemorrhage and acute peritonitis, occurring as a result of blunt force trauma to the front of the abdomen," and "identified two distinct injuries, one caused more than twenty-four hours before death, and one inflicted less than twenty-four hours before death."[50] One of the experts "could not separate the effects of the two injuries," while the other testified that "the second hemorrhage[] 'was an aggravating and probably some factors [sic] contributing,' but it was the earlier injury that was the plain underlying cause of death.'"[51] To the question of whether the second injury *accelerated* the death, as required to convict the defendant under the State's theory, the latter expert stated that he "[did] not know," or in other words, could not attest, to a reasonable degree

---

[45] 528 A.2d 870 (Del. 1987).
[46] *See generally id.*
[47] *Id.* at 871.
[48] *Id.*
[49] *Id.*
[50] *Id.*
[51] *Id.* at 872.

16

of medical probability, that it did so.[52]   The Supreme Court therefore reversed the defendant's conviction, reasoning, in part, that "[a] finding of medical causation may not be based on speculation or conjecture."[53]

In contrast to *Oxendine*, the jury in the instant case was presented with *no evidence* concerning which actor's blows caused Nutter's injuries.   They were therefore left to speculate as to whether Defendant's punches caused Nutter to suffer headaches, memory loss, and vomiting, or whether some or all of those symptoms were instead caused by Moffett's and the third man's actions.   Neither a juror's nor an expert's opinion that it is *possible* that a defendant caused an injury is sufficient to sustain a conviction.[54]   The evidence in this case may suggest such a possibility, but it will stretch no further.   In short, the State failed to present sufficient evidence that Defendant's actions caused the injuries that Nutter ultimately suffered—or, more precisely, a subset thereof sufficiently grave to sustain the charge against Defendant.   Therefore, Defendant's renewed motion for judgment of acquittal must be granted as to the Nutter Conviction, and the Court need not address Defendant's alternative argument that Nutter did not suffer the requisite serious physical injury.

**B. Defendant Is Not Entitled To A New Trial Because Exhibit 4 Was Properly Authenticated Before Admission And Defendant Does Not Raise A Genuine Question As To Its Authenticity.**

**1.  Standard of Review**

"Under Rule 33 of the Superior Court Rules of Criminal Procedure, '[t]he court on motion of a defendant may grant a new trial to that defendant if required in the interest of justice.'"[55]   Pursuant to Rule 33, "[a] new trial is warranted 'only if the error complained of resulted in actual prejudice, or so infringed upon the

---

[52] *Id.*
[53] *Id.* at 873 (citations omitted).
[54] *Id.* (citation omitted).
[55] *Waters v. State*, 242 A.3d 778, 783 (Del. 2020) (alteration in original).

defendant's fundamental right to a fair trial as to raise a presumption of prejudice.'"[56] Applying that standard to the instant case, a new trial is not warranted.

Defendant raises two principal arguments to justify his motion for a new trial. Both relate to Exhibit 4, a video depicting defendant repeatedly punching a helpless Nutter in the head. Defendant's first contention is that Exhibit 4 was not properly authenticated under Delaware Rule of Evidence 901 because Nutter, on the witness stand, could not recall all details of the assault.[57] Defendant's second contention is that the video itself is unreliable, because it "had a high chance of being altered as it was uploaded into Triller . . . an artificial intelligence application . . . which allows . . . videos to be altered"; because it bears some evidence of such alteration (added music and text); and because "[t]he video was grainy . . . [and] did not clearly show the face of any individual[.]"[58]

After thorough consideration, the Court finds that both of Defendant's contentions are without merit. Exhibit 4 was properly authenticated under Rule 901, and Defendant's argument that the video may have been altered, or may not depict what it appears to, is best understood to raise a question of its evidentiary weight, not its admissibility. "In general, the decision whether evidence has been sufficiently authenticated in accordance with D.R.E 901(a) is a matter relegated to the sound discretion of the trial judge."[59] The Court did not abuse that discretion, much less in any manner that compromised the fairness of Defendant's trial. Rule 33 does not, therefore, afford Defendant the relief he seeks.

---

[56] *Ford*, 293 A.3d at 380 (citing *Waters*, 242 A.3d 778; *State v. Milner*, 2023 WL 19080 (Del. Super. Jan. 3, 2023); *State v. Ryle*, 2015 WL 5004903, at *1 (Del. Super. Aug. 14, 2015)).

[57] Defendant's Motion ¶¶ 19–22.

[58] *Id.* at ¶ 23. Defendant also asserts that the Court should grant a new trial given the weight of the evidence presented, but makes no argument to support this position separate from those addressed in Section II.A. of this opinion, *supra*. Therefore, the Court need not and will not address this assertion.

[59] *Demby v. State*, 695 A.2d 1127, 1133 (Del. 1997) (citations omitted).

## 2. The challenged video exhibit was appropriately authenticated and admitted over objection

State's Exhibit 4 was properly authenticated and admitted over Defendant's objection. As the Delaware Supreme Court has repeatedly emphasized, "[t]he 'authentication requirement is fundamental,' but 'it imposes only a lenient burden that is easily met.'"[60] The party offering a piece of evidence "need not conclusively prove the evidence's authenticity, but merely provide a 'rational basis' from which a reasonable finder of fact could draw that conclusion."[61] "[T]here are no hard-and-fast rules about how that may be done. The proponent can point to 'witness testimony, corroborative circumstances, distinctive characteristics,' or other evidence probative of authenticity.'"[62] Of particular note, "[t]here is no requirement under Delaware law . . . that the individual who recorded [a] video must testify in order to authenticate the . . . recording."[63] The standard for authentication is not heightened simply because the video was posted to, and retrieved from, social media.[64]

Here, the distinctive characteristics of Exhibit 4, appearing to show Defendant and Nutter in the circumstances of the assault, combined with Nutter's testimony describing those circumstances and identifying both himself and Defendant in the video, were sufficient for a reasonable juror to conclude that the video was what the state purported it to be, i.e., a recording of Defendant physically attacking Nutter on

---

[60] *Bowers v. State*, 307 A.3d 977, 2023 WL 6938238, at *2 (Del. Oct. 20, 2023) (ORDER) (quoting *Prince v. State*, 284 A.3d 713, 2022 WL 4126669, at *3 (Del. Sept. 9, 2022) (ORDER)); *see also Pierce v. State*, 270 A.3d 219, 231 (Del. 2022) ("The burden for authentication is relatively low." (citations omitted)).

[61] *Schaffer v. State*, 184 A.3d 841, 2018 WL 1747793, at *5 (Del. Apr. 10, 2018) (ORDER) (citing *Cabrera v. State*, 840 A.2d 1256, 1264–65 (Del. 2004)).

[62] *Id.* (quoting *Parker v. State*, 85 A.3d 682, 687–88 (Del. 2014)).

[63] *State v. Lewis*, 2021 WL 1118114, at *6 (Del. Super. Mar. 23, 2021) (citing *State v. Hill*, 2017 WL 1094369, at *2 (Del. Super. Mar. 22, 2017)).

[64] *Parker*, 85 A.3d at 687 ("We conclude that social media evidence should be subject to the same authentication requirements . . . as any other evidence.").

March 8, 2024.

Thus, the State sufficiently authenticated Exhibit 4 to comply with D.R.E. 901. "To satisfy the authentication requirement, the State need only 'establish a rational basis from which the jury could conclude that the evidence is connected to the defendant.' The link between the defendant and the evidence 'need not be conclusive[.]'"[65] In *State v. Hill*, this Court denied the defendant's motion *in limine* seeking to bar admission of a video of an assault for reasons much like those Defendant raised at trial.[66] The state proffered that it would authenticate the video through the testimony of two witnesses: the victim would "testify that the video accurately depict[ed] the altercation by describing the clothes that she was wearing . . . and the injuries she sustained," and an officer would then "testify that [the victim] appeared to be victim [sic] of a recent assault . . . [and would] describe the clothes she was wearing the day of the incident, and the location of the alleged assault in relation to the background of the video."[67] The evidence of authenticity in this case was strikingly similar to that in *Hill*. Here, Nutter identified himself and Defendant. He did so, as in *Hill*, by confirming his clothing and features, and by attesting to his own memory of being hit on the head while prostrate in the dirt. This, too, was evident from the video.

Nutter's testimony authenticating Exhibit 4 is supported by the distinctive characteristics of the video. The Supreme Court has repeatedly approved the use of evidence's content and context for authentication.[68] The video clearly depicts a

---

[65] *White v. State*, 258 A.3d 147, 154 (Del. 2021) (quoting *Cabrera*, 840 A.2d at 1265).
[66] *See generally* 2017 WL 1094369.
[67] *Id.* at *1.
[68] *See, e.g.*, *Parker*, 85 A.3d at 688 ("[T]he substance of the Facebook post referenced the altercation that occurred between Parker and Brown. Although the post does not mention Brown by name, it was created on the same day after the altercation and referenced a fight with another woman."); *White*, 258 A.3d at 155-56 (text messages on cellphone recovered from Defendant's bedroom, which included texts purportedly from his girlfriend using his name, were sufficiently authenticated to be admissible); *Harris v. State*, 301 A.3d 1175, 1184, 2023 WL 4551720 (Del.

20

white man with Defendant's build, clothing, and hair color assaulting Nutter in the manner Nutter testified he was attacked. Even had Nutter never testified, the jury could have easily compared Defendant's appearance in the courtroom to that of the assailant in the video.[69] In the background, a large fire, like that constructed for the party at which Nutter was assaulted, is visible, as is a large crowd consistent with the party. Further, the State was in possession of evidence that the video was posted shortly after the events in question, and this temporal proximity in conjunction with the contents of the video could certainly have allowed a reasonable juror to conclude that it was connected with Defendant.[70]

### 3. Defendant has not raised a genuine question of Exhibit 4's authenticity

"[F]or a genuine question of authenticity to exist, a party would need to present facts or testimony sufficient to bring the issue into contention."[71] The mere suggestion that a video may have been altered does not create such a genuine issue.[72]

---

2023) ("The authenticity of the [audio] recordings is further established through their content and context. A male voice, using [defendant's] SBI number was heard speaking with a woman regarding efforts to convince a man to recant his identification of [defendant] . . . . The discussion mentions a specific dollar amount being paid to the unnamed man [consistent with other testimony]. Furthermore, these discussions heavily concerned the form of the affidavits and gave background to the reason that three different affidavits in three different formats exist, a unique circumstance. The evidence was sufficient to allow a juror to conclude that the recording was authentic.").

[69] The identification of Defendant is further corroborated by his mother's testimony that he admitted to fighting Nutter on the night in question. Defendant's mother's testimony was presented during the State's case-in-chief.

[70] *See Bowers*, 2023 WL 6938238, at *3 (video anonymously sent to officer three hours after eyewitnesses promised to do so, which was consistent with his observations of the scene, was sufficiently authenticated given its "content and context"). Although, when Exhibit 4 was introduced, no witness had yet attested to the date and time the video was posted, Defendant was not prejudiced by the video's admission prior to that testimony—even if that testimony were a prerequisite under the rules of evidence.

[71] *Hill*, 2017 WL 1094369, at *2 (quoting *Graves v. State*, 2006 WL 496140, at *2 (Del. Super. Feb. 2, 2006)).

[72] *State v. Stallings*, 2018 WL 3655862, at *12 (Del. Super. July 31, 2018), *aff'd*, 212 A.3d 804, 2019 WL 2486754 (Del. June 13, 2019) (TABLE) (en banc); *Barnes v. State*, 858 A.2d 942, 944 (Del. 2004) (affirming trial judge's decision to admit time-lapse video that had been edited to play

In *State v. Stallings*, the defendant argued that his trial counsel was ineffective for failing to retain an expert to challenge the authenticity of a video depicting his alleged crime.[73]  In preparation for trial, defense counsel provided the video to an expert, who indicated that the video had been mishandled, and that such mishandling "resulted in manufactured frames, and could just as easily cause[] missing frames," though it could not be determined whether such mishandling was intentional or what any missing frames may have contained.[74]  The Superior Court concluded that failure to pursue this line of inquiry could not form the basis of an ineffective assistance of counsel claim because such "equivocal testimony" would not have prevented the video from being authenticated or introduced.[75]  An *en banc* Supreme Court affirmed the Superior Court's holding without issuing a written opinion.[76]

Defendant has done less to raise a genuine question of Exhibit 4's authenticity than could defense counsel in *Stallings*.  Defendant's sole witness on the video, and specifically on the "Triller" application, provided evidence that was at best equivocal.  That witness, Mr. Workman, merely testified that the "TRILLER" application had the ability to add music to and edit (i.e., splice or excerpt) video, and that this latter capability included an artificial intelligence function to assist users.  He did not testify that the application employed generative artificial intelligence that would allow it to, for example, remove Nutter's actual assailant from the video and replace him with a facsimile of Defendant.  Indeed, he did not testify that the video showed *any* signs of alteration that would be relevant to its authenticity, but merely that it showed signs of editing (music and reordering of video clips).  Defendant raises the specter that advances in artificial intelligence may make falsification of

---

back in real time).

[73] 2018 WL 3655862, at *12.

[74] *Id.* (alteration in original).

[75] *Id.*

[76] 2019 WL 2486754.

22

inculpatory videos easier than in the past. However, Defendant presented no evidence that this was the case here. Moreover, "the risk of forgery exists with any evidence and the rules provide for the jury to ultimately resolve issues of fact."[77] At trial, Defendant raised the possibility that the video could have been altered in such a way that it did not depict what actually occurred. The jury evidently rejected that argument. The Court will not disturb that factual finding.

Defendant's argument that "[t]he video was grainy . . . [and] did not clearly show the face of any individual"[78] also fails to create a genuine issue of authenticity. Just as with the alleged manipulation of the video, the core of Defendant's claim is that there is reasonable doubt about what the video depicts. However, as noted *supra*, "[t]he link between the defendant and the evidence 'need not be conclusive'" for the evidence to be admissible.[79] To put a finer point on it, "[a]n inconclusive link diminishes the weight of the evidence but does not render it inadmissible."[80] Assessing the evidence's weight was the jury's task.

## III. CONCLUSION

For the foregoing reasons, Defendant's motion for judgment of acquittal is **DENIED IN PART AND GRANTED IN PART.** Pursuant to Superior Court Criminal Rule 29(c), the verdict of guilty on count two of the indictment is hereby set aside and a judgment of acquittal is hereby entered on that charge. Defendant's motion for a new trial is **DENIED.**

---

[77] *Parker*, 85 A.3d at 685.
[78] *Id.* at ¶ 23.
[79] *White*, 258 A.3d at 155 (quoting *Cabrera*, 840 A.2d at 1265).
[80] *Id*. (quoting *Cabrera*, 840 A.2d at 1265).

**IT IS SO ORDERED.**

_____
Noel Eason Primos, Judge

NEP/tls

oc:   Prothonotary

cc:   Counsel of Record